1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

Jim Bass Holden,

　　　Petitioner

v.

William Hutchings,[1] et al.,

　　　Respondents

Case No.: 2:13-cv-00668-JCM-EYJ

Order Denying Petition for
Habeas Relief and
Closing Case

## I.   Introduction

Jim Bass Holden ("Petitioner" or "Holden") filed a petition for writ of habeas corpus under 28 U.S.C. § 2254. (ECF No. 88.) This matter is before the court for adjudication on the merits.

Holden claimed he shot Gary Sutton and Michael Panek in self-defense. Eyewitnesses testified to facts supporting Holden's theory regarding his shooting of Panek, however, Holden's journal stated he was compensated for his actions and that he fooled police into believing he acted in self-defense. A jury convicted Holden of (1) first-degree murder of Panek with the use of a deadly weapon; (2) attempted murder of Sutton with use of a deadly weapon; (3) conspiracy to commit murder; and (4) two counts of first-degree kidnapping with use of a deadly weapon. (ECF No. 47-32 at 2.) He was sentenced to, *inter alia*, life imprisonment with parole eligibility after 56 years. (*Id.* at 3.)

In the remaining grounds of his petition,[2] Holden challenges the judgment claiming, *inter alia*, ineffective assistance of trial and appellate counsel, the trial court committed instructional error, and insufficient evidence supports the verdicts. (ECF No. 88.)

///

///

---

[1] According to the state corrections department's inmate locator page, Holden is incarcerated at High Desert State Prison. The department's website reflects William Hutchings is the warden for that facility. At the end of this order, the Court directs the clerk to substitute William Hutchings for respondent Dwight Nevins, under, *inter alia*, Rule 25(d) of the Federal Rules of Civil Procedure.

[2] The court granted the respondent's motion to dismiss grounds 1, 2B, 11 and 12 as untimely and granted Holden's motion to dismiss ground 2(D) after the court determined it was not exhausted. (ECF Nos. 90; 97.)

II. Background[3]

    A. Sutton and Panek attacked Heatwole.

Gary Sutton testified that on February 4, 2004, he and his friend, Michael Panek, were staying at the home of Kourtney Niemeyer and her mother, Leah, at 5564 White Cap in Las Vegas Nevada. (ECF Nos. 42 at 11; 43-2 at 10–11; 44 at 24–25.) Sutton and Panek thought Kourtney's friends, Josh Heatwole and Rodney Steven Evans, planned to rob them. (*Id.* at 11.) Sutton and Panek confronted Heatwole at the Niemeyer home, but Heatwole denied it, so Sutton said he hit Heatwole with his fist and Panek jumped on him, squeezed his throat, and hit him in the face. (*Id.*)

Heatwole testified Panek jumped on top of him, grabbed his throat, squeezed until he could not breathe, and hit him in the face, while Sutton stood nearby holding a knife. (ECF No. 42-1 at 2, 5–6.) Heatwole was shocked because he had no disagreement with them and didn't know what was going on. (*Id.* at 2, 4.) Heatwole sustained two black eyes, a cut above one eye, a sore throat, and marks on his neck, but did not inform police. (*Id.* at 6–7, 12.)

Kourtney testified she heard Heatwole "screaming for his life" so she and Leah went to Heatwole only to find Panek strangling him and Sutton standing by with a knife. (ECF No. 42 at 10, 12–13.) Leah pulled Panek off of Heatwole and Kourtney told Sutton and Panek to get out of the house and "don't ever come back again." (*Id.* at 13.) Sutton testified he and Panek told Heatwole they would return in three days and didn't want to see him (or Evans) there anymore. (ECF No. 43-2 at 12.)

    B. Evans planned to kill Panek and searched for him with an ax.

Holden's codefendant, Evans, testified he pleaded guilty because he had three life sentences hanging over his head and in doing so, he admitted, *inter alia*, that he conspired with

---

[3] The court summarizes the relevant state court record for consideration of the issues in the case. The court makes no credibility findings or other factual findings regarding the truth or falsity of evidence or statements of fact in the state court. The court summarizes the same solely as background to the issues presented in this case and does not summarize all such material. No assertion of fact made in describing statements, testimony, or other evidence in the state court constitutes a finding by this Court. Any absence of mention of a specific piece of evidence or category of evidence does not signify the court overlooked the evidence in considering the claims.

Holden to commit murder and/or battery with a deadly weapon and/or assault with a deadly weapon.[4] (*Id.* at 31–32.)

Evans was a friend of Heatwole and got "very, very angry," when he learned about the attack and saw his Heatwole's injuries. (ECF No. 42-2 at 24, 26.) Evans said Panek was "big" and "[t]hat's why they called him Grizzly." (*Id.* at 27.) Evans knew Panek was a "tough gang-banger," known for packing guns. (*Id.* at 25–26.) Evans tried to obtain a gun because he thought Sutton and Panek would return in 72 hours to kill him. (*Id.* at 26.) Evans thought Panek "was the type of person that would keep coming back," and "would come back with his gang and shoot up your house." (*Id.* at 29.) He said Panek knew where his mother lived and "there's certain people you just can't mess around with, and [Panek] was one of them." (*Id.*)

Evans also testified he obtained an ax and searched for Panek but did not find him. (*Id.* at 36.) He said that he intended to kill Panek and "it would have been okay" if Sutton died too. (*Id.* at 34.) He also said he and Leah agreed Panek could not be in her house, and he may have told Leah to have the phones ready in case Sutton and Panek returned and refused to leave. (*Id.* at 34–35, 40.) Evans planned to take Panek's life if Panek broke into the house. (*Id.* at 32–34.)

C.  Evans enlisted Holden's assistance.

Evans testified he asked Holden for a pistol so he could protect himself and the people at the Niemeyer home. (*Id.* at 26–27, 32, 36.) When Holden refused, Evans asked Holden to "crash on the couch for a couple of days in case they came back." (*Id.* at 26–27.) Evans said he told Holden, "These gang-bangers are coming back," "they beat up my friend real bad," and "they said they were coming back for me in 72 hours." (*Id.* at 37.) Evans said Holden looked after the house with his pistol because Evans thought Sutton and Panek might bring a gun. (*Id.* at 31, 39.) Evans and Holden took turns keeping an eye on the front door for Sutton and Panek. (*Id.*) Evans claimed he never shared his thoughts about killing Sutton and Panek with Holden, never planned anything with Holden, and never paid Holden any money or drugs. (*Id.* at 29, 31, 37, 39.)

///

---

[4] Evans pleaded guilty to voluntary manslaughter with the use of a deadly weapon and battery with the use of a deadly weapon and received a stipulated sentence of 5 to 20 years. (ECF No. 45-1 at 103.)

Kourtney testified Holden was at her house "because he made [her] and [her] mom feel better about staying there," and she never saw or heard about a conspiracy to kill, hurt, or harm Sutton and Panek. (*Id.* at 14.) Heatwole said he told Holden about his beating but was unaware of a conspiracy or agreement to harm Sutton or Panek. (ECF No. 42-1 at 7.)

D.  Holden threatened Sutton and Panek at gunpoint.

Sutton testified he and Panek went to the Niemeyer's house around 5:00 a.m. on February 6, 2004. (ECF Nos. 43 at 21; 43-2 at 12–13.) Sutton said they saw Evans with Bradley McNutt outside in front of the house, but none of them spoke. (*Id.*) Evans testified Sutton and Panek walked to the house looking very hard at him and staring him down. (ECF No. 42-2 at 27.)

Kourtney testified she was surprised and scared when Sutton and Panek entered her home and asked them, "What are you guys doing here?" (ECF No. 42 at 15.) She said she told them, "You guys need to leave. I don't want you here," and went to wake Leah. (*Id.*) Heatwole testified Holden stood up and asked Sutton and Panek, "Who are you guys?" and "What are you guys doing here?" and Kourtney told Holden "That's [sic] the guys that jumped Josh." (ECF No. 42-1 at 8.) Heatwole said Holden told them, "You guys were told not to come back." (*Id.*)

Sutton testified Holden asked if they were "Gary" and "Grizzly," pointed a gun at them, and then told them to sit down. (ECF No. 43-2 at 13.) Sutton and Panek tried to calm Holden down and see what was going on. (*Id.* at 14.) Heatwole said that, although Sutton and Panek made no threats, Panek reached in his bag, and Holden asked him, "What are you reaching for?" (ECF No. 42-1 at 8.) Heatwole said Panek kept reaching in the bag and Holden pulled out his gun and ordered Panek to put the bag down. (*Id.*) Heatwole did not know what Panek reached for, or what he was getting ready to do, but he said Sutton and Panek tried to say they came to make peace and that they made no threats. (*Id.* at 8, 11.)

McNutt testified he entered the Niemeyer home and saw Holden looking angry and pointing a gun at Sutton and Panek. (ECF No. 43 at 28–29.) Evans testified McNutt went inside the home, but returned outside to get him, and when they entered the home, Holden had Sutton and Panek at gunpoint and was telling them to get on the ground and remove their hands from their

1     pockets and backpacks. (ECF No. 42-2 at 27–28.) McNutt testified no one ordered Sutton and
2     Panek out of the house. (ECF No. 43 at 34.)

3           Sutton testified Leah and Kourtney went upstairs while Evans locked the door, retrieved a
4     baseball bat from the back bedroom, and then stood in front of the door, while Holden and Evans
5     started yelling, "You guys messed up," "We're going to handle you guys," and "How do you guys
6     like the fear?" (ECF No. 43-2 at 14.) However, McNutt and Evans each testified Leah came
7     downstairs, locked the door, and said "No one leave the house" or "Nobody is leaving." (ECF Nos.
8     42-2 at 34; 43 at 35.)

9           McNutt testified Holden was angry and hit a couch with the bat. (ECF No. 43 at 33.)
10    However, Sutton said Holden never had the bat; rather, Evans swung it at them without hitting
11    them while Holden held the gun and told them to sit down. (ECF No. 43-2 at 14–15.) Evans said
12    Holden may have hit the couch with the bat to emphasize his command that Sutton and Panek get
13    on the ground, but he never hit anyone. (ECF No. 42-2 at 29–30.) Evans said Holden gave him the
14    bat, but Evans said he put the bat down to emphasize he did not need it to beat them up. (*Id.* at 29.)

15      E.  Sutton secretly dialed 911.

16           Sutton testified he secretly dialed 911 on a cellphone and let it hang next to his leg hoping
17    the operator would hear what was going on and send somebody. (ECF No. 43-2 at 15.) However,
18    when Holden and Evans got closer and started saying stuff like "We're going to kill you guys,"
19    Evans told the operator someone was about to kill them and asked the operator to send someone,
20    until Evans took away the phone. (*Id.*) Evans thought Sutton might have called gang-banger
21    friends. (ECF No. 42-2 at 30.) Kourtney had a phone but did not call 911. (ECF Nos. 42 at 19.)

22           Evans testified he was enraged at Sutton and Panek and did not ask them to leave. (ECF
23    No. 42-2 at 29, 34.) Evans identified himself on the 911 recording telling Sutton and Panek "If we
24    don't kill you mother f'ers," "You're going to die," and "We're going to start beating the f--- out
25    of you piece by piece." (*Id.* at 29.) Evans said he told Sutton and Panek to look at what they did to
26    Heatwole's face. (*Id.*) Evans said he wanted to take their lives. (*Id.*) Evans said he might have
27    asked, "Can you feel the fear?" (*Id.* at 38.) Evans also identified himself on the 911 recording
28    telling Holden to "F'ing shoot his ass" meaning shoot Sutton or Panek. (*Id.* at 39.) Evans said he

wished Holden had given him the gun so he could do it. (*Id.* at 40.) McNutt said Holden stood by the door and told Sutton and Panek he was going to shoot one of them in the kneecap and Evans encouraged him to do so. (ECF No. 43 at 34–35.)

F.  Holden shot and killed Panek.

Sutton testified Panek and Holden stood in front of each other about six feet apart, when Panek, who had his hand in his pocket, took a step and lunged toward Holden with an open knife in a striking motion within Holden's reach. (ECF No. 43-2 at 16.) Sutton said two shots went off, Panek fell to his knees and face. (*Id.*) Sutton said Holden held them at gunpoint for a total of three or four minutes, and although he could have shot them sooner, he did not shoot until Panek made a stabbing motion at Holden with the knife. (ECF No. 43 at 22–23.) He said Panek would have "probably" stabbed Holden if Holden had not shot him. (*Id.*)

McNutt testified it looked like Panek and Holden fought over the gun, and Panek tried to grab the gun and point it the opposite way, and then two shots fired. (*Id.* at 57–58.) McNutt said Panek said "I'm sorry" and had his hands up in the air. (*Id.* at 35) Evans said he heard a click coming from Sutton and saw Panek climbing over the couch, one foot on the cushions, one foot on the back, and his hands all over the pistol. (ECF No. 42-2 at 30.) Evans said Sutton tackled Panek and Holden, so Evans jumped on and hit Sutton on the head. (*Id.* at 30.) Evans said he was beside Holden and Panek when Holden shot Panek twice. (*Id.* at 30–31.)

G.  Holden shot Sutton in the arm.

Sutton testified he tackled Holden after the initial shots, and they went down grabbing for the gun on the floor. (ECF No. 43-2 at 16.) He said he and Holden had their hands on the gun when someone hit Sutton on the head. (*Id.*) He said Holden got the gun, they stood up, and then Sutton walked to the kitchen. (*Id.*) Sutton said he heard Evans say, "Jim, shoot him, shoot him" and when Sutton turned around, Holden was pointing the gun at him. (*Id.* at 16–17.) Sutton ducked, and Holden shot him in the arm. (*Id.* at 17.) McNutt testified he saw Sutton wrestling with Evans, a shot fired, Sutton fell to the ground, and then McNutt ran out the front door. (ECF No. 43 at 36.)

///

6

Sutton testified after Holden shot him in the arm, he saw Holden and Evans standing over Panek and heard one of them say, "He's dead." (ECF No. 43-2 at 17.) Sutton went to Panek, realized he was dead, and left. (*Id.*) Evans said he told Sutton he could leave. (ECF No. 42-2 at 31.) Evans said he and Holden never discussed or planned any of the events of that morning. (*Id.*)

H.  Investigation

Las Vegas Metropolitan Police Department Officer Michael Souder testified he responded to Sutton's 911 call, heard shots, and saw people exit the Niemeyer home. (ECF No. 43-2 at 1–2.) Souder found Panek inside the house lying in a hands up position with a knife in his hand but did not realize he was dead, so he took the knife out of Panek's hand, put it on the stereo, and handcuffed him. (*Id.* at 2.) Souder said he also saw a firearm on the couch. (*Id.*)

Metro Senior Crime Scene Analyst Monte Spoor testified he collected from the Niemeyer home: (1) a backpack; (2) a Louisville Slugger aluminum bat; (3) a Ruger .45 caliber semiautomatic firearm (with a round in the chamber and a round in the magazine); and (4) a knife on top of the stereo. (ECF No. 43-1 at 35, 37–40, 46.) He also collected four expended cartridge cases from the living and dining rooms and speculated the Ruger magazine held 8 rounds. (*Id.* at 36–37, 39–40, 42–43.) Spoor also impounded a leather shoulder holster containing semiautomatic magazines containing live ammunition that matched the ammunition in the Ruger. (*Id.* at 37, 40–41.) Spoor said the coroner found brass knuckles inside Panek's pants pockets. (*Id.* at 45.)

Forensic pathologist Rexene Worrell testified Panek died from a gunshot wound to the back of the head. (*Id.* at 23, 26.) The wound's entrance indicated the gun was against Panek's head, touching his skull, when he was shot. (*Id.* at 25.) She found the bullet embedded in the base of the skull indicating the path of the bullet was "execution type style," as it was directly downward, and perpendicular. (*Id.* at 26, 28.) She agreed the same angle could have resulted from Panek leaping toward the gunman provided the gun was against his head. (*Id.* at 28.)

I.  Holden's Arrest for a Separate Murder and Incriminating Journal Statements.

Metro Lieutenant Harley Morgan testified that on March 24, 2004, he found Geraldo Ojeda Garcia dead from a single gunshot wound to the head at an apartment on Civic Center Drive in North Las Vegas. (ECF No. 42-2 at 44–46.) Morgan's investigation led him to Holden, and based

on the evidence and Holden's statement, Morgan requested that Holden be prosecuted for Garcia's murder. (*Id.*)

Federal Public Defender Leslie Fatowe testified that in April 2004, she represented Holden's jail cell mate, Steven Ray Hall. (ECF No. 42-1 at 32.) Hall told Fatowe that Holden gave him a "journal" when Holden was transported to another jail and asked Fatowe whether the journal could help him obtain a lower sentence. (*Id.*) Fatowe gave the journal to Detective Todd Williams. (*Id.*) Metro Questioned Document Examiner, Jimmy Smith, testified he compared the 29-page handwritten journal to Holden's known handwriting exemplars, and opined Holden wrote the journal. (ECF No. 43 at 17–18.) The state district court admitted the following statements contained in Holden's journal for the purpose of proving motive and intent for the shootings of Sutton and Panek:

> property [sic] of Jim Holden  4-7-04
>
> This is going to be my jernal [sic] of my life for my family so they know what I was thinking and feling [sic] because I want them to know what was going thru [sic] my thots [sic]
>
> . . . .
>
> 4-8-04
>
> I cant [sic] sleep every time I close my eyes I see those two people I killed the one on Whitecap I did not wont [sic] to kill but he pulled a knife but the other one was so easy I wonder what it felt like when I shot him in the head
>
> . . . .
> all those people on the outside that are not doing time with me that were sapose [sic] to be on my side those rat bastards I'm going to kill them for betraying me number one on my list smoky were [sic] supose [sic] to be bussnes [sic] partners I go and do drug deal after drug deal as an inforser [sic] and now he doesn't know me
>
> . . . .
> Just like those f'ing rats that im [sic] going to kill and torcher . . . Gary . . . revenge will be mine . . .
>
> Mark My words
> [Signed] Jim Holden
>
> . . . .

///

///

8

4-16-04

Were [sic] did I go wrong how did I get cote [sic] I was so stupid to trust a woman that rat bitch walked me right to those pigs she gave me right to them. I should have shot that bitch at the apartment to [sic] but no I had to be a nice hitman . . . I dont [sic] like all theas [sic] homo little fags in here. I want to just start chokeing [sic] them one by one and throw them in the f'ing garbige [sic] like I did with the brain, scull [sic] fragments and blood from the one on witecap [sic] and I should have killed that other little punk I shot that night on witecap [sic] when the cops and C.A.T. was [sic] right out frount [sic] of the house and evon [sic] herd [sic] the shots and I never left the block because he pulled a knigh [sic] on me [sic] dumb ass pull a knigh [sic] when you got a 45 in your face nice move well he dont [sic] have to think about that much more dose [sic] he and his friend that I shot in the arm I should have not aimed at the arm thinking he was only 16 the lieing [sic] Little [sic] bastard should have poped [sic] him in the head to [sic] I like head shots one and it's done. I was born to do this and was making so much money doing it payed [sic] to kill is easy when you just dont [sic] have any feelings [sic] no remorse you just dont [sic] care one after another. The one on witcap [sic] did not pay much though they were pore [sic] but I got those stuped [sic] pig [sic] to think it was self defens [sic] evon [sic] after that punk Gary Sutton told the [sic] that I sat them down and evon [sic] told them they were not leaving alive that little cop calling pussy I am going to him to . . . for free payback is a bitch.

"To Murder or to torcher that is the question!"
[Signed] Jim Holden

. . . .

4-17-04

. . . .

kill Gary

. . . .

(ECF Nos. 43-1 at 5–6; 47-19 at 6; 47-21 at 72–73; 107-2.)[5]

///

///

---

[5] The trial transcript submitted to the court fails to contain Detective Williams's full trial testimony and omits the portion during which the state district court admitted Holden's journal into evidence. (*See* ECF Nos. 41-1 at 94, 97, 103; 41-2 at 13, 15; 42-1 at 2; 42-2 at 50; 45 at 160.) The court requested the respondents produce the missing portions of the transcript, but the respondents stated the transcript of the missing portion of William's testimony is unavailable. (ECF Nos. 106, 107.) The respondents, however, submitted a copy of the state district court trial record showing the state district court admitted the redacted portion of the journal as Exhibit 92, and the respondents furnished a copy of Exhibit 92 to the court. (ECF Nos. 107-2; 107-3.) The contents of the trial exhibit and its admission into evidence are not disputed and Williams testified about the journal at the preliminary and pretrial evidentiary hearings. (ECF No. 47-21 at 35.) The trial record supports the conclusion that the redacted version of the journal, designated as Exhibit 92, was admitted at trial. Moreover, it appears the respondents submitted the journal to the state supreme court during the direct appeal. (ECF No. 41-2 at 13.) Accordingly, the court gives full weight to the state supreme court's fact determinations concerning Holden's statements in the journal.

J.   State Court Proceedings

Holden's trial was conducted over a seven-day period, and the jury deliberated for less than two hours before returning a general verdict convicting Holden of all charges. (ECF No. 45-1 at 107–15.) Holden unsuccessfully challenged his convictions on direct appeal and in postconviction proceedings. (ECF Nos. 41 at 8–20; 41-1 at 55–66; 45 at 152–61; 45-1 at 59–65, 191–93.)

III.  Governing Standards of Review

A.   Antiterrorism and Effective Death Penalty Act (AEDPA)

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a federal court may not grant a petition for a writ of habeas corpus on any claim that was adjudicated on the merits in state court unless the state court decision was contrary to, or involved an unreasonable application of, clearly established federal law as determined by United States Supreme Court precedent, or was based on an unreasonable determination of the facts in light of the evidence presented in the state-court proceeding. 28 U.S.C. § 2254(d).

A state court's decision is contrary to clearly established Supreme Court precedent, within the meaning of 28 U.S.C. § 2254(d)(1), "if the state court applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases" or "if the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court." *Lockyer v. Andrade*, 538 U.S. 63, 73 (2003) (quoting *Williams v. Taylor*, 529 U.S. 362, 405–06 (2000), and citing *Bell v. Cone*, 535 U.S. 685, 694 (2002)). A state court's decision is an unreasonable application of clearly established Supreme Court precedent within the meaning of 28 U.S.C. § 2254(d)(1) "if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Id.* at 75 (quoting *Williams*, 529 U.S. at 413). "The 'unreasonable application' clause requires the state court decision to be more than incorrect or erroneous . . . [rather] [t]he state court's application of clearly established law must be objectively unreasonable." *Id.* (quoting *Williams*, 529 U.S. at 409–12) (internal citation omitted).

///

///

10

1

### B. Standards for Effective-Assistance-of-Counsel

2      On petitioner's claims of ineffective assistance of counsel, he must demonstrate (1) the

3 attorney's "representation fell below an objective standard of reasonableness[;]" and (2) the

4 attorney's deficient performance prejudiced the petitioner such that "there is a reasonable

5 probability that, but for counsel's unprofessional errors, the result of the proceeding would have

6 been different." *Strickland v. Washington*, 466 U.S. 668, 687–88, 694 (1984). "A reasonable

7 probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. It is a

8 petitioner's burden to show "counsel made errors so serious that counsel was not functioning as

9 the 'counsel' guaranteed . . . by the Sixth Amendment." *Id.* at 687.

10      "[T]he Sixth Amendment does not guarantee the right to perfect counsel; it promises only

11 the right to effective assistance . . . ." *Burt v. Titlow*, 571 U.S. 12, 24 (2013). When considering an

12 ineffective assistance of counsel claim, a court "must indulge a strong presumption that counsel's

13 conduct falls within the wide range of reasonable professional assistance . . . ." *Strickland*, 466

14 U.S. at 689 (citation omitted). On the performance prong, the issue is not what counsel might have

15 done differently but whether counsel's decisions were reasonable from his or her perspective at

16 the time. *Id.* at 689–90. A petitioner making an ineffective assistance claim "must identify the acts

17 or omissions of counsel that are alleged not to have been the result of reasonable professional

18 judgment." *Id.* at 690. In considering such claims, a court is obligated to "determine whether, in

19 light of all the circumstances, the identified acts or omissions were outside the wide range of

20 professionally competent assistance." *Id.* Under *Strickland*, strategic choices made "after thorough

21 investigation of law and facts relevant to plausible options are virtually unchallengeable." *Id.* On

22 the other hand, "strategic choices made after less than complete investigation are reasonable

23 precisely to the extent that reasonable professional judgments support the limitations on

24 investigation." *Id.* at 690–91.

25      "Establishing that a state court's application of *Strickland* was unreasonable under §

26 2254(d) is all the more difficult" because "[t]he standards created by *Strickland* and § 2254(d) are

27 both 'highly deferential,'" and when applied in tandem, "review is 'doubly so.'" *See Harrington*

28 *v. Richter*, 562 U.S 86, 105 (2011) (internal citations omitted); *see also Cheney v. Washington*,

614 F.3d 987, 995 (9th Cir. 2010) ("When a federal court reviews a state court's *Strickland* determination under AEDPA, both AEDPA and *Strickland*'s deferential standards apply; hence, the Supreme Court's description of the standard as 'doubly deferential.'") (citing *Yarborough v. Gentry*, 540 U.S. 1, 6 (2003)).

To prevail on an ineffective assistance of appellate counsel claim, a petitioner "must show a reasonable probability that, but for his counsel's [unreasonable performance], he would have prevailed on his appeal." *Smith v. Robbins*, 528 U.S. 259, 285–86 (2000). "[A]ppellate counsel who files a merits brief need not (and should not) raise every nonfrivolous claim, but rather may select from among them to maximize the likelihood of success on appeal." *Id.* at 288 (citing *Jones v. Barnes*, 463 U.S. 745 (1983)). The ninth circuit court of appeals has explained that in applying *Strickland*'s two prongs to a claim of ineffective assistance of appellate counsel:

> [t]hese two prongs partially overlap . . . In many instances, appellate counsel will fail to raise an issue because she foresees little or no likelihood of success on that issue; indeed, the weeding out of weaker issues is widely recognized as one of the hallmarks of effective appellate advocacy . . . Appellate counsel will therefore frequently remain above an objective standard of competence (prong one) and have caused her client no prejudice (prong two) for the same reason—because she declined to raise a weak issue.

*Miller v. Keeney*, 882 F.2d 1428, 1434 (9th Cir. 1989) (citations and footnotes omitted). Failure to present a weak issue on appeal neither falls below an objective standard of competence nor causes prejudice for the same reason – the issue had little or no likelihood of success on appeal. *Id.*

C.  Standards for Sufficiency of the Evidence

According to *Jackson v. Virginia*, a jury's verdict must stand if, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. 443 U.S. 307, 319 (1979). A federal habeas petitioner faces a "considerable hurdle" when challenging the sufficiency of evidence to support his conviction. *Davis v. Woodford*, 384 F.3d 628, 639 (9th Cir. 2004). The *Jackson* standard is applied with reference to the substantive elements of the criminal offense as defined by state law. *Id.* (citing *Jackson*, 443 U.S. at 324 n.16.) A reviewing court, faced with a record of historical facts that support conflicting inferences, must presume the trier of fact resolved any conflicts in favor of the prosecution and defer to that resolution, even if the resolution by the state

court's trier of fact of specific conflicts does not affirmatively appear in the record. *Id.* (citing *Jackson*, 443 U.S. at 326.)

When the deferential standards of AEDPA and *Jackson* are applied together, the question for decision on federal habeas review is whether the state court's decision unreasonably applied the *Jackson* standard to the evidence at trial. *See, e.g., Juan H. v. Allen*, 408 F.3d 1262, 1274–75 (9th Cir. 2005) (citations omitted). Moreover, when a petitioner's challenge to the sufficiency of the evidence is subject to AEDPA, there is a double dose of deference that can rarely be surmounted. *See Boyer v. Belleque*, 659 F.3d 957, 964–65 (9th Cir. 2011) (noting the *Jackson* standard is deferential because it only permits relief when "no rational trier of fact" could find the essential elements for guilt beyond a reasonable doubt, and AEDPA "adds a second level of deference" by permitting relief only where a state court's application of *Jackson* is "objectively unreasonable.")

IV.  Discussion

A.  Ground 2 — Effective Assistance of Trial and Appellate Counsel

Holden alleges ineffective assistance of counsel in violation of the Sixth Amendment, in grounds 2(A), 2(C), and 2(E) through 2(K).

1.  Ground 2(A) — Failure to Communicate Plea Offer

Holden claims trial counsel was ineffective in plea negotiations. (ECF No. 88 at 12–14.)

a.  Additional Background

At the close of trial, the parties conducted the following colloquy:

[DEFENSE COUNSEL]: And, Your Honor, just for the record, Mr. Holden just reminded me – I mean, I don't recall being made an offer with regard to this case. I had asked to try and speak with my client prior to starting trial, and my client has explained to me that he said you'll have to take a hit with regard to this, but there was not a specific offer being made.

[THE STATE]: Actually, I said he's got to take the big hit as to the other case, that I would be more than willing to give him a deal similar to Mr. Evans' in this case, but –

[THE DEFENDANT]: No, you never said that.

[THE STATE]: – he's also got to plead to first-degree murder with use in the other one, and that's where the negotiations broke down. Not that that's wholly relevant at all, but there was that discussion that happened with [defense counsel] present.

13

1
2    [THE DEFENDANT]: There was never any mention of anything near Mr. Evans'
     deal, ever.

3    THE COURT: In this case?

4    [THE DEFENDANT]: As to any kind of offer towards me.

5    THE COURT: He's talking about –

6    [THE STATE]: I told him that he's got to deal both cases together, that you can't
     do one case and not the other. If he wants to deal, he's got to deal them both, and
7    that this case was highly negotiable.

8    [DEFENSE COUNSEL]: Yeah, I don't really remember that – you know, for
     correcting the record, perfecting the record.

9    THE COURT: Okay. I don't know why that would be, but that is your decision not
     mine.
10

11   (ECF No. 41-2 at 72.) In his initial appeal from the denial of his state postconviction petition,

12   Holden based this claim on what he described as, two "on point" cases, *i.e., Missouri v. Frye*, 566

13   U.S. 134 (2012) and *Lafler v. Cooper*, 566 U.S. 156 (2012). (ECF No. 45 at 146. The state supreme

14   court remanded for an evidentiary hearing because "the record reflects some confusion about the

15   nature of the plea offer and whether there was more than one offer made to appellant." (ECF No.

16   45 at 146–57.)

17       On remand, the state district court held a postconviction evidentiary hearing at which

18   defense counsel testified he represented Holden for two murder trials but did not recall plea

19   negotiations for either case. (ECF No. 45-1 at 11–12.) Counsel said, "we felt this was a defensible

20   case; we thought it was something we could win." (*Id.* at 13.) Counsel said it was "not usual" to

21   "have the prosecutor speak directly to my client or my client directly to the prosecutor" because

22   "it's their life, it's their future, it's their case and I'm gonna do what – as they choose." (*Id.* at 13–

23   14.) Counsel said, "[w]ith regard to plea negotiations, I don't remember – I don't remember ever

24   being part of a process. I don't know – and then there's a comment about them talking together. I

25   wouldn't – I'm not – I can't say whether it happened or didn't. I don't remember one way or

26   another." (*Id.* at 15.) Counsel asserted, "[i]f there's an offer I certainly could not imagine not

27   relaying that offer." (*Id.* at 16.) Counsel confirmed he did not "personally" recall "any offer being

28   made that might have related to dealing with both cases together." (*Id.* at 17.)

14

The prosecutor for both of Holden's murder trials testified he never made "a specific" offer to Holden for the "White Cap" case. (*Id.* at 31.) He said, "There was a discussion between [Holden] and myself early in the trial but we never got into specifics." (*Id.*) He explained that before the jury was sworn in the case in the "White Cap" trial, he and defense counsel discussed the "Garcia" case was "very bad" for Holden and whether it was "resolvable." (*Id.*) The prosecutor said when Holden arrived in court, defense counsel said, "Let's sit here; you want to talk; have a conversation" and the prosecutor conversed directly with Holden in the presence of defense counsel. (*Id.* at 31–32.) The prosecutor said, "[d]uring the course of the conversation [Holden] made it abundantly clear to me that he would not accept pleading straight up in the [Garcia] murder because it potentially would result in a life without the possibility of parole." (*Id.* at 32.) The prosecutor explained these were "preliminary discussions and – that broke down and we went to trial," and that he made no formal plea offer because Holden "rejected any notion of reaching an offer." (*Id.* at 32, 40, 42.) The prosecutor further explained: "I can't specifically remember if I told him he had to plead to the whole sheet or if it was just the one charge," but he recalled Holden's "reaction was, well, I could go to prison for the rest of my life then if that happens or at least 40 years." (*Id.* at 32–33.) The prosecutor said he replied, "[W]ell, right; there's two separate murders here, you know" and Holden said, "I'm not doing that" so they brought in the jury. (*Id.* at 33.)

The state district court again denied postconviction relief. (*Id.* at 59–64.)

### b.  Legal Standards

The Supreme Court has held "defense counsel has the duty to communicate formal offers from the prosecution to accept a plea on terms and conditions that may be favorable to the accused." *Frye*, 566 U.S. at 145. Where a prosecutor makes no plea offer, however, there can be no ineffective assistance of counsel claim under *Strickland. See Lafler*, 566 U.S. at 160, 168 (explaining, "[i]f no plea offer is made . . . the issue [of effective assistance of counsel in considering whether to accept it] . . . simply does not arise.").

///

///

///

15

c.   State Court Determination

The state supreme court affirmed the denial of the claim as follows:

> [A]ppellant filed his petition on April 17, 2009. The district court denied the petition in its entirety and appellant appealed the denial. On December 12, 2012, this court affirmed in part, reversed in part, and remanded for the district court to hold an evidentiary hearing regarding whether counsel was ineffective, pursuant to *Missouri v. Frye*, 566 U.S. ___, 132 S. Ct. 1399 (2012), for failing to relay a plea offer to appellant. *Holden v. State*, Docket No. 58143 (Order Affirming in Part, Reversing in Part, and Remanding, December 12, 2012). After an evidentiary hearing held on April 11, 2013, the district court determined that counsel was not ineffective. This appeal followed.

> Appellant claims that the district court erred in denying his claim that counsel was ineffective for failing to communicate a formal plea offer to him. To prove ineffective assistance of counsel, a petitioner must demonstrate that counsel's performance was deficient in that it fell below an objective standard of reasonableness, and resulting prejudice such that there is a reasonable probability that, but for counsel's errors, the outcome of the proceedings would have been different. *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984); *Warden v. Lyons*, 100 Nev. 430, 432-33, 683 P.2d 504, 505 (1984) (adopting the test in *Strickland*). Both components of the inquiry must be shown, *Strickland*, 466 U.S. at 697, and the petitioner must demonstrate the underlying facts by a preponderance of the evidence, *Means v. State*, 120 Nev. 1001, 1012, 103 P.3d 25, 33 (2004). Defense counsel has a duty to communicate formal plea offers and, to demonstrate prejudice, a defendant must demonstrate a reasonable probability that he would have accepted the more favorable plea offer but for counsel's deficient performance and that the plea would have been entered without the State's withdrawing the offer or the district court refusing to accept the plea. *Frye*, 566 U.S. at ___, 132 S. Ct. at 1409. We give deference to the district court's factual findings if supported by substantial evidence and not clearly erroneous but review the court's application of the law to those facts de novo. *Lader v. Warden*, 121 Nev. 682, 686, 120 P.3d 1164, 1166 (2005).

> We conclude that substantial evidence supports the district court's decision. At the evidentiary hearing the district court heard testimony from trial counsel, appellant, and the prosecutor. Based on that testimony, the district court concluded that appellant failed to demonstrate that there was a formal plea offer, that trial counsel failed to communicate an offer to appellant, or that there was prejudice. Specifically, the district court found that no formal plea offer was made because the terms were not set: the prosecutor told appellant that he would also have to plead guilty to first-degree murder in another case in order to receive a plea deal in the instant case, and appellant rejected those negotiations immediately because they would result in a life sentence in the other murder case. Trial counsel did not fail to communicate these negotiations to appellant; appellant spoke directly to the prosecutor about the negotiations. The district court's factual findings are supported by the record and, based on those findings, we agree with the district court's conclusion that appellant failed to demonstrate that trial counsel provided ineffective assistance.

(ECF No. 45-1 at 191–93.)

///

d.   Analysis of Ground 2(A)

The record supports the state supreme court's determination that the prosecutor extended no formal plea offer to Holden. The record establishes Holden personally discussed the possibility of a plea bargain with the prosecutor in the presence of defense counsel. Those discussions "broke down" because Holden "rejected any notion of reaching an offer" due to the prosecutor's insistence that a bargain for the instant case was contingent upon Holden's acceptance of a life sentence for his other pending murder case. Because the prosecutor made no formal plea offer, counsel was not ineffective in failing to communicate one. *See Lafler*, 566 U.S. at 168. Therefore, the application of *Strickland* was objectively reasonable, and Holden is not entitled to federal habeas corpus relief for ground 2(A).

2.   Ground 2(C) — Failure to Investigate Panek's Violent Gang Activity

Holden claims trial counsel was ineffective in failing to investigate and present evidence of Panek's violent gang activity to support the self-defense theory. (ECF No. 88 at 18–22.)

At trial, several witnesses testified Panek was a known member of the 21st Street Gang, and due to his size, was known as "Grizzly." (ECF Nos. 42-1 at 3; 42-2 at 25–27, 29; 43 at 19.) Panek's friend, Snyder, testified "[i]t was just known" that he was in the gang, but she never saw him do anything violent in the three years she knew him. (ECF No. 43-2 at 5–6, 8.) Evans, however, testified Panek "was a tough character, a tough gang-banger," "known for packing guns," and "was the type of person" who "would come back with his gang and shoot up your house." *See*, *supra*, p. 3. Coroner Worrell testified she found, from prior incidents, a bullet in Panek's spine and a scar on his thigh the size and shape of a bullet, and Spoor testified the coroner's report stated that brass knuckles were found in Panek's pants pockets. (ECF No 43-1 at 26–27, 45.)

Holden's postconviction counsel sent an investigator to uncover evidence that Panek was a violent individual but "was unable to locate anything of interest at all." (ECF No. 41 at 22–25.)

The state supreme court rejected this claim as follows:

> [A]ppellant argues that trial counsel was ineffective for failing to conduct an adequate investigation into the gang affiliation and violent history of victim Michael Panek. Appellant failed to demonstrate that counsel's performance was deficient or that he was prejudiced. The record shows that trial counsel was aware of Panek's gang affiliation, as counsel cross-examined several witnesses about the

fact that Panek had been a member of the 21st Street gang and carried guns. Appellant has failed to identify with specificity what other evidence could have been discovered through further investigation, and his own investigator was unable to uncover other evidence of Panek's alleged violent history. <u>See</u> <u>Hargrove v. State</u>, 100 Nev. 498, 502, 686 P.2d 222, 225 (1984). Thus, the district court did not err in denying this claim.

(ECF No. 45 at 155–56.)

The record confirms Holden failed to demonstrate the existence of prior acts of violence on the part of Panek other than those presented at trial. Moreover, the record supports the determination that trial counsel elicited testimony about Panek's gang membership, reputation for violence and carrying weapons, and specific acts of violence against Heatwole. Moreover, Heatwole and Evans each testified that prior to the shootings they told Holden (a stranger to Panek) about Panek's attack on Heatwole. For these reasons, the state supreme court's application of *Strickland* and determination that counsel's performance was neither deficient nor prejudicial, was objectively reasonable. Holden is not entitled to federal habeas corpus relief for ground 2(C).

3.   Ground 2(E) —Failure to Object to Statement about Methamphetamine Ingestion

Holden claims appellate counsel was ineffective in failing to challenge the admission of Holden's statement that he ingested methamphetamine on the night of the offenses, in violation of the Fifth, Sixth, and Fourteenth Amendments. (ECF No. 88 at 25–27.)

Trial counsel objected to admission of Holden's statement to police that he ingested methamphetamine before the shootings because the state did not file a pretrial motion to admit prior bad acts. (ECF No. 43-1 at 3–4.) The state argued Holden's statement was admissible as *res gestae*, was relevant to Holden's "state of mind, the reasonableness of his actions," and Holden did not file a motion precluding the statement. (*Id.* at 3.) The state district court decided it was unclear whether Holden said he ingested methamphetamine four to five hours before the shooting (which occurred around 5:00 a.m.) or four to five hours before his statement (which occurred around 8:00 a.m.). (*Id.* at 4.) The court admitted the statement because (1) it was relevant to Holden's state of mind and self-defense theory; and (2) it was for the jury to determine whether it

affected his judgment.[6] (*Id.* at 4–5.) The court, however, cautioned the jury concerning its consideration of bad acts evidence and instructed the jury on intoxication evidence as follows:

> No act committed by a person while in a state of voluntary intoxication shall be deemed less criminal by reason of his condition, but whenever the actual existence of any particular purpose, motive or intent is a necessary element to constitute a particular species or degree of crime, evidence of intoxication may be taken into consideration in determining such purpose, motive or intent. Intoxication alone cannot reduce murder to voluntary manslaughter.

(ECF No. 44 at 58, 63.)

The admission of evidence violates federal due process only if its admission rendered the trial fundamentally unfair. *Estelle v. McGuire*, 502 U.S. 62, 70 (1991). The ninth circuit court of appeals has held the admission of evidence of prior bad acts violates the federal constitutional guarantee of due process of law "only if there are no permissible inferences the jury may draw" from that evidence. *Jammal v. Van de Kamp,* 926 F.2d 918, 920 (9th Cir. 1991). And, even then, the evidence must be of such a highly inflammatory nature as to necessarily prevent a fair trial. *Jammal,* 926 F.2d at 920–21 ("The … issue is not whether introduction of [the evidence] violated state law evidentiary principles, but whether the trial court committed an error which rendered the trial so arbitrary and fundamentally unfair that it violated federal due process.") (citations omitted).

According to NRS § 48.045(2): "Evidence of other crimes, wrongs or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith." "It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident." *Id.* Evidence of prior bad acts is also admissible and relevant to rebut the assertion of self-defense. *See Ochoa v. State*, 115 Nev. 194, 200–01, 981 P.2d 1201, 1205–06 (1999).

The state supreme court rejected this claim in postconviction proceedings as follows:

> [A]ppellant contends that appellate counsel was ineffective for failing to argue on direct appeal that the district court improperly admitted his voluntary statement to the police admitting to ingesting methamphetamine less than five hours prior to the crimes. Appellant failed to demonstrate prejudice. There was

---

[6] The state district court granted defense counsel's request for permission to call an expert should the statement be admitted; however, Holden did not call an expert. (ECF No. 43-1 at 4.)

overwhelming evidence presented at trial that appellant committed the offenses and did not act in self-defense. Thus, appellant did not demonstrate that there was a reasonable probability of success on appeal had appellate counsel raised this claim. Accordingly, we conclude that the district court did not err in denying this claim.

(ECF No. 45 at 157–58.)

The state supreme court reasonably applied *Strickland*'s prejudice prong in determining there was no reasonable probability appellate counsel would have succeeded with a challenge to the state district court's admission of Holden's statement. The record reveals the state district court minimized the prejudicial impact of Holden's statement by cautioning the jury about its treatment of bad act evidence and by providing an intoxication instruction favorable to the self-defense theory. Moreover, Holden's statement about his drug use had no impact on the fairness of the trial because Holden admitted in his own handwritten journal that he told Sutton and Panek they would not leave the house alive, shot Sutton and Panek, was hired to do so, and initially fooled police into believing he acted in self-defense. *See, supra*, pp. 8–9. For the foregoing reasons, Holden and is therefore not entitled to federal habeas relief for ground 2(E).

### 4. Ground 2(F) — Failure to Challenge the Sufficiency of Evidence for Attempted Murder with Use of a Deadly Weapon

Holden claims appellate counsel was ineffective because he failed to challenge the sufficiency of the evidence supporting the intent element for his conviction for the attempted murder of Sutton. (ECF No. 88 at 27–28.)

In Nevada, "[a]ttempted murder is the performance of an act or acts which tend, but fail, to kill a human being, when such acts are done with express malice, namely, with the deliberate intention unlawfully to kill." *Valdez v. State*, 124 Nev. 1172, 1197, 196 P.3d 465, 481 (2008) (citations omitted). Express malice is defined as "that deliberate intention unlawfully to take away the life of a fellow creature, which is manifested by external circumstances capable of proof." NRS § 200.020(1). Under NRS § 193.200, intent "is manifested by the circumstances connected with the perpetration of the offense." "Thus, 'intent can rarely be proven by direct evidence of a defendant's state of mind, but instead is inferred by the jury from the individualized, external circumstances of the crime.'" *Valdez*, 124 Nev. at 1197, 196 P.3d at 481 (citation omitted). A jury

may also "infer intent to kill from the manner of the defendant's use of a deadly weapon." *Id.* (citation omitted).

The state supreme court rejected this claim as presented to that court as follows:

> [A]ppellant argues that appellate counsel was ineffective for failing to argue on direct appeal that there was insufficient evidence of attempted murder, as there was no evidence that he had the necessary intent to commit murder. Appellant failed to demonstrate that counsel's performance was deficient or that he was prejudiced. The jury heard testimony that appellant pointed a gun at the victims and threatened to kill them. When one of the victims lunged at him, appellant shot and killed him and then pointed the gun at the other victim and shot at him as he attempted to flee, hitting him in the arm. Thus, we conclude that sufficient evidence supported the jury's verdict that appellant intended to kill the victim. See NRS 193.200 (intent); Valdez v. State, 124 Nev. 1172, 1197, 196 P.3d 465, 481 (2008) (stating that the jury may infer intent to kill from "the individualized, external circumstances of the crime" and "the manner of the defendant's use of a deadly weapon" (internal quotations omitted)). As such, any challenge to the sufficiency of the evidence for the attempted murder conviction would not have had a reasonable probability of success on appeal, and appellate counsel was not ineffective for failing to raise it. Accordingly, we conclude that the district court did not err by denying this claim.

(ECF No. 45 at 154.)

The record reflects that, based on the individualized circumstances and Holden's use of the firearm, a rational jury could conclude Holden harbored the requisite intent to kill Sutton when he shot him. *Jackson*, 443 U.S. at 319. Sutton testified Holden held him at gunpoint and told him he was going to kill him. Sutton, fearing for his life, secretly called 911 and told the operator to send someone because he was about to be killed. Sutton, Evans, and McNutt each testified Holden held Sutton and Panek at gunpoint until he shot and killed Panek and then after struggling over the gun with Sutton, he immediately pointed the gun at Sutton and shot him. And, in his handwritten journal, Holden stated he told Sutton and Panek they would not leave the house alive. *See, supra*, pp. 3–9. Although a bullet was left in the chamber of the firearm that Holden used to shoot Sutton and Panek, Evans said he told Sutton he could leave the house after Holden shot Sutton, and Holden stated in his journal that he aimed for Sutton's arm, the presence of evidence suggesting Holden might not have intended to kill Sutton does not render appellate counsel's failure to assert the claim unreasonable. For purposes of determining whether sufficient evidence supports a conviction on direct appeal, appellate courts presume the jury resolved all conflicts in the evidence in favor of the prosecution and defer to that resolution. *See Jackson*, 443 U.S. at 326.

21

For the foregoing reasons, the state supreme court reasonably applied *Strickland* in determining appellate counsel's failure to challenge the sufficiency of the evidence for the intent element for the attempted murder of Sutton was neither deficient nor prejudicial. Holden is not entitled to federal habeas corpus relief on ground 2(F).

5.   Ground 2(G) — Failure to Challenge Lying-in-Wait Instruction

Holden claims ineffective assistance of trial and appellate counsel because they failed to challenge the omission of a definition for "lying in wait" for the first-degree murder instruction, and thereby alleviated the state's burden to prove malice aforethought for first-degree murder, in violation of the Fifth and Fourteenth Amendments. (ECF No. 88 at 28–32.)

At Holden's trial, the state proposed a definition of "lying in wait" based on a California jury instruction. (ECF No. 42 at 26–29.) However, in Nevada, "lying in wait" was defined as "watching, waiting, and concealment from the person killed with the intention of killing or inflicting bodily injury upon that person." *Collman v. State*, 116 Nev. 687, 717, 7 P.3d 426, 445 (2000) (footnote and citation omitted) (emphasis omitted). No one suggested the *Collman* definition, and defense counsel argued it was unnecessary to define "lying in wait," because "it's something that can be argued" and "[i]t speaks for itself." (*Id.* at 26–27.) The state district court chose "to leave it to [the jury's] common everyday belief" and instructed on first-degree murder as stated in NRS § 200.030(1)(a), i.e., "Murder perpetrated by means of poison, lying in wait, or torture, or by any other kind of willful, deliberate and premeditated killing, as defined in these instructions, is Murder of the First-degree." (ECF Nos. 41-2 at 48; 42 at 27–29; 44 at 31.)

In closing remarks, defense counsel argued Holden was "not lying in wait," and it was "not an ambush"; rather, "[i]t's kids who have nothing better to do who are just hanging out." (ECF No. 41-2 at 60.) Counsel further argued "there was no lying-in-wait" instead, "[w]hat we have is a bunch of individuals who are afraid and scared because of what [Sutton and Panek] had done to [Heatwole] a night or two earlier, and they are simply in that house." (*Id.* at 61, 65.)

To obtain federal habeas relief based on an improper jury instruction, a petitioner must establish the instruction so infected the entire trial that the resulting conviction violates due process. *Estelle,* 502 U.S. at 72 (citations and quotations omitted); *see also Cupp v. Naughten,* 414

U.S. 141, 146 (1973) ("Before a federal court may overturn a conviction resulting from a state trial . . . it must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some right which was guaranteed to the defendant by the Fourteenth Amendment."). "It is well established that the instruction 'may not be judged in artificial isolation,' but must be considered in the context of the instruction as a whole and the trial record." *Id.* (quoting *Cupp*, 414 U.S. at 147). Where an instructional error is found, it is subject to harmless error review, i.e., a determination whether the instructional error had a "substantial and injurious effect or influence in determining the jury's verdict." *Calderon v. Coleman*, 525 U.S. 141, 147 (1998) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993)).

The state supreme court rejected this claim as follows:

> [A]ppellant argues that counsel was ineffective at trial and on direct appeal for failing to challenge the jury instruction defining first-degree murder because it did not include a definition for "lying in wait." Appellant failed to demonstrate that his counsel's performance was deficient or that he was prejudiced. Trial counsel specifically requested that the jury not be instructed on the definition of "lying in wait." Appellant failed to demonstrate that counsel's decision was deficient and that a definition was needed for "lying in wait." See Dawes v. State, 110 Nev. 1141, 1146, 881 P.2d 670, 673 (1994) ("Words used in an instruction in their ordinary sense and which are commonly understood require no further defining instructions."). Further, appellant failed to demonstrate a reasonable probability that the outcome of the proceedings would have been different had the jury been instructed on a definition of "lying in wait." Trial counsel argued extensively during closing argument that appellant did not lie in wait for the victims. Moreover, there was sufficient evidence for the jury to conclude that appellant was concealed in the house waiting for the victims, and evidence supports the State's theory that he wanted to kill them. See Collman v. State, 116 Nev. 687, 717, 7 P.3d 426, 445 (2000) (defining "lying in wait" as "watching, waiting, and concealment from the person killed with the intention of killing or inflicting bodily injury upon that person" (emphasis omitted)). Therefore, the district court did not err in denying this claim.

(ECF No. 45 at 154–55.)

The record supports the state supreme court's conclusion that trial counsel did not perform deficiently. Counsel made an objectively reasonable tactical decision to oppose a definition for "lying in wait" in favor of arguing against a lying-in-wait theory for first-degree murder based on a broader common-sense interpretation of that phrase.

The record also demonstrates the state supreme court reasonably applied *Strickland*'s prejudice prong in determining there was no reasonable probability the result of the proceedings

would have been different had trial or appellate counsel challenged the court's failure to provide the jury with the *Collman* definition for "lying in wait." Nothing in the record suggests the jury was confused or misled by the first-degree murder instruction or that the jury asked for a definition of "lying in wait." The instructions as a whole left no ambiguity that the state was required to prove, beyond a reasonable doubt that Holden had the intent to kill Panek in order to convict Holden for first-degree murder.[7] The instruction defining murder as "perpetrated by means of . . . lying in wait" was followed by an instruction that first-degree murder also required the state to prove beyond a reasonable doubt that the killing was willful, deliberate, and premeditated, and went on to define those terms. (ECF No. 44 at 31–32.) And the court instructed the jury that murder "by any of the various means by which death may be occasioned" required proof of malice aforethought. (*Id.* at 28–29.)

There was also evidence supporting inferences that Holden was "lying in wait" according to the *Collman* definition. "Waiting" was inferable from the testimony that Holden was armed and present at the home in case Sutton and Panek returned to the house. "Watching" was inferable from Evans's testimony he and Holden took turns "keeping an eye on the door" for Sutton and Panek. Holden's "concealment" was inferable because he was a stranger to Sutton and Panek, was awake, armed, and positioned in the living room near the front door at 5:00 a.m. when Sutton and Panek entered the home, and he revealed his gun immediately after confirming they had attacked Heatwole. Holden's journal statements also provided a basis to infer he lay in wait.

Finally, inferences that Holden harbored an intent to kill Panek while lying in wait were supported by witnesses who testified Holden held Sutton and Panek at gunpoint for several minutes while blocking their exit and threatened to kill them. Sutton also testified he told the 911 operator to send someone because he believed he was about to be killed and Holden shot and killed Panek and then shot Sutton. And, finally, Holden's own handwritten journal stated he told Sutton and Panek that they would not leave the house alive.

---

[7] Holden's reliance on *Stromberg v. California*, 283 U.S. 359 (1931) is misplaced because the state supreme court, as the final arbiter of state law, found the instruction on the definition of "lying in wait" was not error. (ECF 88 at 28–30.)

Under the circumstances, the state supreme court reasonably concluded there was no reasonable probability the result of the trial proceedings would have been different had trial counsel requested the *Collman* definition for "lying in wait." Likewise, it reasonably concluded there was no reasonable probability that appellate counsel would have succeeded had he challenged the state district court's failure to provide a "lying in wait" definition. Accordingly, Holden is not entitled to federal habeas corpus relief for ground 2(G).

### 6.   Ground 2(H) — Failure to Challenge the Sufficiency of the Evidence for First-Degree Kidnapping with Use of a Deadly Weapon

Holden claims ineffective assistance of trial and appellate counsel because they failed to challenge the sufficiency of the evidence for the convictions for first-degree kidnapping with use of a deadly weapon. (ECF No. 88 at 32–35.)

The state charged Holden with first-degree kidnapping of Sutton and Panek, respectively, and with use of a deadly weapon "for the purpose of committing murder." (ECF No. 44 at 26.) The state district court instructed the jury on dual convictions as follows: "When associated with a charge of murder, kidnapping does not occur if the movement is incidental to the murder and does not increase the risk of harm over and above that necessarily present in the commission of such offense." (ECF No. 44 at 35.)

In *Pascua v. State*, the Nevada Supreme Court held "in a kidnapping case arising from a single course of conduct, the seizure, restraint, or movement of a victim may substantially exceed that required to complete the associated crime charged." 122 Nev. 1001, 1003, 145 P.3d 1031, 1032 (2006). "In such cases, dual convictions for kidnapping and murder arising out of the same course of conduct are proper." *Id.* "For example, dual convictions could stand where the object is murder, and the victim is kidnapped for that purpose." *Id.* at 1006, 145 P.3d at 1034.

The state supreme court rejected this claim as presented to that court as follows:

> [A]ppellant argues that counsel was ineffective for failing to argue at trial and on direct appeal that there was insufficient evidence to support his conviction for first-degree kidnapping with the use of a deadly weapon. Specifically, appellant contends that dual convictions for kidnapping and murder are improper because any movement or restraint of the victims was incidental to the murder. We conclude that the district court did not err in denying this claim. Dual convictions for kidnapping and murder are proper "where the seizure, restraint or movement of the victim substantially exceeds that required to complete the associated crime charged." <u>Pascua v. State</u>, 122 Nev. 1001, 1006, 145 P.3d 1031, 1034 (2006)

(quoting <u>Mendoza v. State</u>, 122 Nev. 267, 274, 130 P.3d 176, 180 (2006)). Here, the jury heard testimony that appellant restrained the victims for up to 10 minutes, during which time appellant's co-conspirator blocked the exit and appellant pointed a gun at the victims and threatened to kill them. The jury was adequately instructed on the requirements for dual conviction of kidnapping and murder, and could have found from this evidence that the restraint substantially exceeded that required to complete the murder. Thus, appellant failed to demonstrate that a challenge to the dual convictions would have a reasonable probability of success on appeal. Accordingly, the district court did not err in denying this claim.

(ECF No. 45 at 153.)

The state supreme court, as the final arbiter of state law, held the jury was adequately instructed on the requirements for dual convictions for kidnapping and murder. And the record shows a rational jury could determine Holden's restraint of Sutton and Panek was not incidental to, but instead substantially exceeded, that required for the purpose of committing murder. Holden did not kill Sutton and Panek as soon as they entered the home and identified themselves. Instead, Holden restrained them at gunpoint for several minutes and threatened to shoot them or cause bodily injury while directing them to sit down and get on the floor. The door to the house was locked, and a threat was made that no one leave. Sutton called 911 for help while Holden stood between Sutton and Panek and the nearest exit. Holden and Evans threatened to kill Sutton and Panek, and Evans goaded Holden to shoot them. Holden shot and killed Panek when Panek lunged at him with a knife. And he shot Sutton after they struggled for the gun and Sutton attempted to flee toward the kitchen. Finally, Holden's references to torture in his journal could reasonably lead to inferences his restraint of Sutton and Panek was deliberate and substantially exceeded that required to commit murder. *See, supra*, pp. 3–9; *Jackson*, 443 U.S. at 319.

The state supreme court reasonably applied *Strickland* in determining there was no reasonable probability the result of the proceedings would have been different had trial or appellate counsel challenged the sufficiency of the evidence to support the convictions for first-degree kidnapping. Thus, Holden is not entitled to federal habeas corpus relief for ground 2(H).

7.   Ground 2(I) — Failure to Challenge Preclusion of Heatwole's Testimony

Holden claims appellate counsel was ineffective because he failed to challenge the preclusion of defense counsel's questions about Heatwole's thoughts, feelings, and fears about Panek in order to show Heatwole was in fear for his life. (ECF No. 88 at 35–39.)

The state district court sustained objections to trial counsel's attempts to examine (1) what Heatwole was thinking when Panek had his hands on his windpipe; (2) what he felt when Panek put his hands on his windpipe; (3) whether he felt that Panek was threatening his life; and (4) his concerns after Sutton and Panek beat him up and departed the Niemeyer home. (ECF No. 42-1 at 5–7.)

The state supreme court rejected this claim as presented to that court as follows:

> [A]ppellant argues that appellate counsel was ineffective for failing to argue on appeal that the district court improperly precluded testimony from Josh Heatwole about his fear that Panek would injure or kill him. Appellant failed to show that he was prejudiced. Substantial evidence was presented that Panek had assaulted Heatwole several days prior to the shooting. In particular, Heatwole testified that he was scared when Panek got on top of him and attempted to strangle him, and another witness testified that Heatwole was "screaming for his life" at the time. Thus, because extensive evidence was admitted about Panek's violent behavior and Heatwole's fear of him, appellant could not show that this issue had a reasonable probability of success on appeal. Appellant also claims that appellate counsel was ineffective for failing to argue that the district court improperly precluded him from introducing specific instances of violent conduct by Panek. However, other than the attack on Heatwole, which was presented to the jury, appellant fails to identify any specific instances of violence that were precluded at trial. See id. Thus, the district court did not err in denying this claim.

(ECF No. 45 at 156.)

The trial testimony supports reasonable inferences about Heatwole's thoughts, feelings, and fears after Sutton and Panek's attack. Heatwole was "shocked" and "scared" when Panek hit him in the face a couple of times with his fist, jumped on top of him, grabbed his "Adam's apple" and started squeezing, such that Heatwole "couldn't breathe or talk." Heatwole was scared because he could not get Panek off of him but managed to get enough air to scream for Leah, and Kourtney said she heard Heatwole "screaming for his life." After Leah pulled Panek off, Panek tried to rush at Heatwole again, but Leah stood between them. Heatwole told Evans and Holden about Panek's attack on him, and it was obvious to others that Heatwole suffered two black eyes, marks on his neck, and a swollen lip. *See, supra*, pp. 2–4. Heatwole retreated to a room upstairs to "calm" himself when Sutton and Panek returned to the house and was not present when Holden shot them. (ECF No. 42-1 at 10.) Others testified they feared Sutton and Panek would return to harm people at the Niemeyer house and that was why Holden was present at the house with a pistol. *See, supra*, pp. 2–4. For these reasons, the state supreme court reasonably applied *Strickland*'s prejudice prong

to the record in concluding there was no reasonable probability appellate counsel would have succeeded with a challenge to the court's preclusion of Heatwole's additional testimony. Thus, Holden is not entitled to federal habeas corpus relief for ground 2(I).

        8.  Ground 2(J) —Failure to Object to Unrecorded Bench Conferences

Holden claims trial counsel was ineffective in violation of the Sixth Amendment because he failed to object to unrecorded bench conference proceedings at trial. (ECF No. 88 at 39–41.)

Before opening statements, the state district court informed counsel:

> THE COURT: [I]f there's anything beyond objection foundation, objection hearsay, objection relevance, objection asked and answered, then it needs to be at side-bar, and that's in the hallway in this department . . .
>
> . . . .
>
> So if it's more than foundation, relevance, hearsay, or anything like that, we have a side-bar. If it requires, you know, a significant argument, I don't do it in front of the jury. Additionally – and then we'll make a record about it later.

(ECF No. 43-1 at 8.)

A State "must provide an indigent defendant with a transcript of prior proceedings when that transcript is needed for an effective defense or appeal." *Britt v. North Carolina*, 404 U.S. 226, 227 (1971) (footnote omitted). A court need only provide an indigent defendant with "'a record of sufficient completeness' to permit proper consideration of (his) claims." *Mayer v. City of Chicago,* 404 U.S. 189, 194–95 (1971) (citations omitted).[8]

The state supreme court rejected this claim as presented to that court as follows:

> [A]ppellant argues that trial counsel was ineffective for failing to ensure that unrecorded bench conferences were put on the record. Other than asserting in a conclusory fashion that he was denied meaningful review, appellant failed to explain how he was prejudiced. He did not specify the subject matter of the listed bench conferences or explain their significance. See Daniel v. State, 119 Nev. 498, 508, 78 P.3d 890, 897 (2003). Thus, he failed to support this claim with specific facts that, if true, would entitle him to relief. See Hargrove, 100 Nev. at 502, 686 P.2d at 225. Accordingly, the district court did not err in denying this claim.

---

[8] Holden relies on Nev. Sup. Ct. R. 250(5)(a) but that rule applies only to cases in which the death penalty is or may be sought. Nev. Sup. Ct. R. 250(1) ("The provisions of this rule apply only in cases in which the death penalty is or may be sought or has been imposed, including proceedings for post-conviction relief from a judgment of conviction and sentence of death.") Even in such cases, "SCR 250 and due process do not require the presence of the court reporter at every sidebar conference," if the court makes "a record of the contents of such conferences at the next break in the trial" and attorneys are permitted to comment on the record. *Daniel v. State,* 119 Nev. 498, 508, 78 P.3d 890, 897 (2003).

(ECF No. 45 at 158.)

The record reveals trial counsel's failure to object was reasonable because the state district court afforded counsel an opportunity to place significant side-bar discussions on the record and the state district court regularly placed the subject of side-bar conferences on the record and invited further comment from counsel. Moreover, Holden failed to identify the significance of any unrecorded side-bar conference to any of his claims or demonstrate the record of side-bar conferences is insufficient to permit proper consideration of his claims. As such, Holden failed to show a reasonable probability the result of the proceedings would have been different had trial counsel objected to unrecorded bench conferences or added comments about side-bar conferences that are not already included in the record. Holden is therefore not entitled to federal habeas corpus relief for ground 2(J).

9.   Ground 2(K) — Failure to Challenge Jury Instructions

a.   Ground 2(K)(1) — Implied Malice and Malice Aforethought

Holden claims trial counsel was ineffective because he failed to object to the phrase, "heart fatally bent on mischief," contained in the malice aforethought instruction and the phrase, "abandoned and malignant heart," contained in the implied malice instruction, as unconstitutionally vague in violation of federal due process. (ECF No. 88 at 41–46.)

Counsel posed no objection to instructions 6 and 7 and the state district court instructed the jury on malice aforethought and express and implied malice as follows:

> Malice aforethought means the intentional doing of a wrongful act without legal cause or excuse or what the law considers adequate provocation. The condition of mind described as malice aforethought may arise, from anger, hatred, revenge, or from particular ill will, spite or grudge toward the person killed. It may also arise from an unjustifiable or unlawful motive or purpose to injure another, proceeding from a heart fatally bent on mischief or with reckless disregard of consequences and social duty. Malice aforethought does not imply deliberation or the lapse of any considerable time between the malicious intention to injure another and the actual execution of the intent but denotes an unlawful purpose and design as opposed to accident and mischance.

> Express malice is that deliberate intention unlawfully to take away the life of a human being, which is manifested by external circumstances capable of proof.

> Malice may be implied when no considerable provocation appears, or when all the circumstances of the killing show an abandoned and malignant heart.

29

(ECF Nos. 41-2 at 46; 44 at 29–30.) Additionally, before opening remarks, the state district court explained the presumption of innocence and the state's burden of proof beyond a reasonable doubt. (ECF No. 43-1 at 10–11.) Throughout its instructions to the jury, the state district court repeatedly instructed the burden of proof for the charges was "beyond a reasonable doubt." (ECF No. 44 at 32, 34, 40, 42, 47, 51, 57, 60.) Finally, before closing arguments, the state district court again instructed the jury on the presumption of innocence and the state's "burden of proving beyond a reasonable doubt every material element of the crime charged and that the Defendant is the person who committed the offense." (*Id.* at 60.)

> The state supreme court rejected this claim as follows:
>
> > [A]ppellant first asserts that counsel should have objected to the words "abandoned and malignant heart" in the jury instruction on implied malice,
> >
> > > [FN 2] This instruction, which tracks the language of NRS 200.020, stated: "Malice may be implied when no considerable provocation appears, or when all circumstances of the killing show an abandoned and malignant heart."
> >
> > as well as the words "heart fatally bent on mischief" in the definition of malice aforethought,
> >
> > > [FN 3] This instruction stated: "[The condition of mind described as malice aforethought] may also arise from any unjustifiable or unlawful motive or purpose to injure another, proceeding from a heart fatally bent on mischief or with reckless disregard of consequences and social duty."
> >
> > because they are vague and meaningless. This court has previously considered and rejected these exact arguments. Leonard v. State, 117 Nev. 53, 78-79, 17 P.3d 397, 413 (2001). Thus, appellant failed to demonstrate that trial counsel's performance was deficient or that he was prejudiced by counsel's failure to object to these instructions.

(ECF No. 45 at 158–59.)

> The state supreme court reasonably determined trial counsel's failure to object to the language in the malice aforethought and implied malice instructions did not constitute deficient or prejudicial performance. The state supreme court, as the final arbiter of state law, had previously determined the phrases, "abandoned and malignant heart" and "heart fatally bent on mischief," contained in the instructions, was not so confusing as to deny a defendant a fair trial. And Holden points to nothing in the record suggesting his jury expressed confusion about those phrases. *See*

30

*Leonard v. State*, 117 Nev. 53, 78–79, 17 P.3d 397, 413 (2001) (holding, "[a]bsent some indication that the jury was confused by the malice instructions (including the instruction on malice aforethought and express malice), a defendant's claim that the instructions were confusing is merely speculative.") (citation omitted). There is also nothing to suggest the phrases were fundamentally unfair in violation of due process as the record shows the state district court instructed the jury on the presumption of innocence, the state's obligation to prove "every material element" of the crimes charged and that Holden did not act in self-defense, beyond a reasonable doubt, and that the jury was to consider the instructions as a whole and not single out any particular sentence. *See, supra*, p. 30; ECF No. 44 at 23; *see also Estelle,* 502 U.S. at 72.

The state supreme court also reasonably determined there was no reasonable probability the result of the proceedings would have been different had counsel objected to the "abandoned and malignant heart" phrase in the implied malice instruction because the instructions did not have a substantial and injurious effect on the verdict. Implied malice played no part in the jury's decision to convict Holden of first-degree murder for killing Panek as that verdict demonstrates the jury necessarily found Holden killed Panek with express malice. *See Scott v. State*, 92 Nev. 552, 556–57, 554 P.2d 735, 738 (1976) (holding a finding of first-degree murder necessarily includes a finding the defendant committed the murder deliberately, willfully, and with premeditation, and those elements conclusively established express malice). Likewise, the conviction for the attempted murder of Sutton necessarily demonstrates the jury determined Holden harbored express malice when he shot Sutton. (ECF No. 44 at 50.)

For these reasons, the state supreme court reasonably applied *Strickland* to the state court record in determining counsel's failure to object to the implied malice and malice aforethought instructions was neither deficient nor prejudicial and Holden is not entitled to federal habeas corpus relief for ground 2(K)(1).

b.  Ground 2(K)(2) — Premeditation and Deliberation

Holden claims trial counsel was ineffective because he failed to challenge the jury instructions as improperly approving the concept of "instantaneous" premeditation and deliberation making first-degree murder indistinguishable from second-degree murder and

relieving the state of its burden to prove each essential element of the charged offense, in violation of due process. (ECF No. 88 at 45–46.)

In *Byford v. State,* the state supreme court held an instruction that failed to separately define premeditation and deliberation improperly blurred the distinction between first- and second-degree murder. 116 Nev. 215, 233–37, 994 P.2d 700, 712–15 (2000). It held an instruction on premeditation, pursuant to *Kazalyn v. State*, 108 Nev. 67, 75, 825 P.2d 578, 583 (1992), was error because it failed to separately define "deliberation." *Id.* at 234–37, 994 P.2d at 714–15. In *Byford*, the state supreme court set forth an instruction for state district courts to present to juries in murder cases, which conveys that premeditation and deliberation are separate prerequisites for first-degree murder. *Id.*

In Holden's case, the jury was not given a *Kazalyn* instruction, but was instructed on premeditation and deliberation as required under *Byford*. (ECF Nos. 42-1 at 46; 44 at 32–33.)[9]

The state supreme court rejected Holden's claim as follows:

> [A]ppellant asserts that counsel was ineffective for failing to object to the jury instruction on premeditation and deliberation because it relieved the State of its burden of proof as to essential elements of first-degree murder. Appellant failed to demonstrate deficiency or prejudice, as the instruction that was given was identical to the instruction approved by this court in Byford v. State, 116 Nev. 215, 236-37, 994 P.2d 700, 714 (2000). Therefore, the district court did not err in denying this claim.

(ECF No. 45 at 158–60.)

Trial counsel's failure to object to the premeditation instruction was objectively reasonable because the state supreme court, as the final arbiter of state law, previously directed the state district courts to use the specific instruction that was given to Holden's jury. Holden furthermore presents no basis upon which to conclude there is a reasonable probability the instructions, as a whole, deprived him of a fair trial in violation of due process, because the instructions did not omit an essential element of the crimes alleged, or relieve the state of its burden of proof. *See Estelle,* 502 U.S. at 72. The state supreme court therefore reasonably applied *Strickland* in concluding trial counsel's failure to challenge the premeditation and deliberation instruction was neither deficient or prejudicial and Holden is not entitled to federal habeas corpus relief for ground 2(K)(2).

---

[9] *Compare* ECF No. 44 at 32–33, *with Byford*, 116 Nev. 234-37, 994 P.2d 714–15.

c.   Ground 2(K)(3) — Reasonable Doubt

Holden claims trial counsel was ineffective because he failed to object to the reasonable doubt instruction on the grounds it minimized the state's burden of proof. (ECF No. 88 at 46–47.)

The state "must prove beyond a reasonable doubt every element of a charged offense." *Victor v. Nebraska*, 511 U.S. 1, 5 (1994) (citing *In re Winship,* 397 U.S. 358 (1970)). "[S]o long as the court instructs the jury on the necessity that the defendant's guilt be proved beyond a reasonable doubt, the Constitution does not require that any particular form of words be used in advising the jury of the government's burden of proof." *Id.* (internal and other citations omitted). "Rather, 'taken as a whole, the instructions [must] correctly conve[y] the concept of reasonable doubt to the jury.'" *Id.* (quoting *Holland v. United States*, 348 U.S. 121, 140 (1954)). According to *Victor*, in reviewing the constitutionality of a reasonable doubt instruction, the question "[i]s whether there is a reasonable likelihood that the jury understood the instructions to allow conviction based on proof insufficient to meet the *Winship* standard." *Id.* at 6 (relying on *Estelle,* 502 U.S. at 72 n.4 (holding the inquiry, is not whether the jury could have applied an instruction in an unconstitutional manner, but whether there is a reasonable likelihood it did so)).

Trial counsel proposed an alternative reasonable doubt instruction, and the state did not object, however, the state district court gave an instruction corresponding to NRS § 175.211:

> The Defendant is presumed innocent until the contrary is proved. This presumption places upon the State the burden of proving beyond a reasonable doubt every material element of the crime charged and that the Defendant is the person who committed the offense.
>
> A reasonable doubt is one based on reason. It is not mere possible doubt but is such a doubt as would govern or control a person in the more weighty affairs of life. If the minds of the jurors, after the entire comparison and consideration of all the evidence, are in such a condition that they can say they feel an abiding conviction of the truth of the charge, there is not a reasonable doubt. Doubt to be reasonable must be actual, not mere possibility or speculation.
>
> If you have a reasonable doubt as to the guilt of the Defendant, he is entitled to a verdict of not guilty.

(ECF Nos. 41-2 at 48; 42 at 23–24; 44 at 60.)

///

33

The state supreme court rejected this claim as follows:

> [A]ppellant asserts that counsel was ineffective for failing to object to the jury instruction on reasonable doubt because it minimized the State's burden of proof. We disagree. The district court gave the reasonable doubt instruction mandated by NRS 175.211, and we have repeatedly upheld the constitutionality of that instruction. See, e.g., Chambers v. State, 113 Nev. 974, 982-83, 944 P.2d 805, 810 (1997); Evans v. State, 112 Nev. 1172, 1191, 926 P.2d 265, 277 (1996). Thus, appellant failed to demonstrate that trial counsel was deficient in failing to challenge this instruction or that he was prejudiced.

(ECF No. 45 at 158–60.)

The state supreme court's application of *Strickland* to the record was objectively reasonable. The record demonstrates counsel did not perform deficiently because he objected to the state statutory reasonable doubt instruction by proposing an alternative instruction. Moreover, it was futile to object to the reasonable doubt instruction that was given to the jury because the reasonable doubt instruction presented to Holden's jury had been held to comport with federal due process. *See Ramirez v. Hatcher*, 136 F.3d 1209, 1210–15 (9th Cir. 1998) (holding the instruction codified in NRS § 175.211 did not violate federal due process under Supreme Court authority where the charge as a whole correctly communicated the concepts of presumed innocence, the burden of proof, and the nature of reasonable doubt) (emphasis added). And, as discussed, the state district court thoroughly instructed the jury on the presumption of innocence, and the State's burden to prove each element of the crimes charged beyond a reasonable doubt. *See, supra*, p. 30. Thus, Holden is not entitled to federal habeas relief for ground 2(K)(3).

### d.   Ground 2(K)(4) — Equal and Exact Justice

Holden claims trial counsel was ineffective because he failed to object to the "equal and exact justice" phrase contained in instruction 48 on the grounds it permitted the jury to convict him based on a lesser standard of proof than the constitution requires and created a reasonable likelihood the jury would not apply the presumption of innocence. (ECF No. 88 at 47–48.)

Defense counsel did not object to the state district court's instruction 48, which included the "equal and exact justice language" as follows:

> Now you will listen to the arguments of counsel who will endeavor to aid you to reach a proper verdict by refreshing in your minds the evidence and by showing the application thereof to the law, but, whatever counsel may say, you will

bear in mind that it is your duty to be governed in your deliberation by the evidence as you understand it and remember it to be and by the law as given to you in these instructions, with the sole, fixed and steadfast purpose of doing equal and exact justice between the Defendant and the State of Nevada.

(ECF Nos. 41-2 at 48; 44 at 71.)

The state supreme court rejected this claim as follows:

Appellant also argues that counsel should have objected to the instruction on "equal and exact justice" because it improperly minimized the State's burden of proof and created a reasonable likelihood that the jury would not apply the presumption of innocence. This court has rejected this claim where, as here, the jury was also properly instructed on the presumption of innocence and the State's burden of proof. <u>See</u> <u>Leonard v. State</u>, 114 Nev. 1196, 1209, 969 P.2d 288, 296 (1998). Thus, appellant failed to show deficient performance or prejudice, and the district court did not err by denying this claim.

(ECF No. 45 at 158–60.)

The state supreme court reasonably applied *Strickland* in determining trial counsel's failure to challenge the "equal and exact justice" phrase was objectively reasonable as the language had previously been approved by the state supreme court. It also reasonably concluded there was no reasonable probability the result of the proceedings would have been different as the record demonstrates the state district court correctly and separately informed the jury on the presumption of innocence and the state's burden of proof beyond a reasonable doubt. *See, supra*, p. 30. Moreover, the "equal-and-exact-justice" phrase "does not concern the presumption of innocence or burden of proof." *See Leonard*, 114 Nev. at 1209, 969 P.2d at 296. There is also no basis to conclude it was reasonably likely the jury applied the language in the instruction in an unconstitutional manner. *See Estelle,* 502 U.S. at 72 n.4. On this record, there was no reasonable probability that had counsel objected to the "equal and exact justice" language, the result of the proceedings would have been different. Thus, Holden is not entitled to federal habeas relief for ground 2(K)(4).

D. Ground 3 — State's Use of "Victim"

Holden claims the description of Panek as a "victim" created an impermissible inference of guilt in violation of due process under the Fourteenth Amendment. (ECF No. 88 at 48–50.)

The Supreme Court has recognized that certain courtroom practices are so inherently prejudicial that they deprive the defendant of a fair trial. *Estelle v. Williams,* 425 U.S. 501, 513

35

(1976) (holding the state cannot compel an accused to stand trial before a jury while dressed in identifiable prison clothes but providing no relief to the defendant because he waived objection) (citing *Holbrook v. Flynn,* 475 U.S. 560, 568 (1986)). In *Flynn,* the Supreme Court held the seating of "four uniformed state troopers" in spectator seats behind the defendant at trial was not so inherently prejudicial that the defendant was denied a fair trial. 475 U.S. at 562, 571. The Supreme Court stated, when considering a challenge to a courtroom arrangement, "the question must be ... whether 'an unacceptable risk is presented of impermissible factors coming into play'" in the jury's consideration of the case. *Id.* at 570 (quoting *Williams,* 425 U.S. at 505.)

In Holden's case, defense counsel moved that the state refer to Panek as "the deceased" rather than "the victim." (ECF No. 44-1 at 2.) Counsel argued there was no question that Holden took Panek's life; the question was whether it was justified or not. (*Id.* at 2–3.) Counsel argued reference to Panek as the "victim" suggested he was in fact the victim, however, Panek was not a "victim" if the killing was justified. (*Id.* at 3.) The state district court ruled the parties could refer to Panek using his name or a descriptor consistent with that parties' theory of the case, i.e., "the victim" or "the deceased." (*Id.*) Additionally, the state district court provided the jury with self-defense instructions that referred to Panek as a possible "assailant," not a "victim," and instructed the jury, *inter alia*, that the state had to prove beyond a reasonable doubt that the defendant did not act in self-defense. (ECF No. 44 at 53–60.)

In Holden's direct appeal, the state supreme court rejected this claim as follows: "[W]e have also considered Holden's remaining arguments, including those related to reference to Panek as a 'victim,' . . . and conclude that none of these alleged errors deprived Holden of a fair trial." (ECF No. 41-1 at 65–66) (footnote omitted). The court applies AEDPA deference to the state supreme court's determination because the text of its order of affirmance explained its reasons for its decision. *See Ylst v. Nunnemaker*, 501 U.S. 797, 802 (1991) (holding an unexplained order is one "whose text or accompanying opinion does not disclose the reason for the judgment.") Moreover, the state supreme court's reason "[f]airly appear[s] to rest primarily on federal law or [is] interwoven with [federal law]." *Id.* (quoting *Coleman v. Thompson*, 501 U.S. 722, 740 (1991)); (ECF 47-34 at 22.)

The state supreme court's determination was neither contrary to, nor constitutes an unreasonable application of, Supreme Court authority, and does not constitute an unreasonable determination of the facts on the state court record. The state district court's ruling that the parties may refer to Panek in a way that was consistent with their theory of the case softened any prejudicial impact of the state's use of the term "victim" when describing Panek. The state district court further softened any prejudicial impact by affording the defense the opportunity to use its own descriptor to emphasize the state had the additional burden to prove beyond a reasonable doubt that Holden did not kill Panek in self-defense. Finally, the state district court's self-defense instructions referred to Panek as a possible "assailant," not a "victim" and instructed the jury that state must prove beyond a reasonable doubt that Holden did not act in self-defense. On this record, the state supreme court reasonably concluded the state's use of "victim" to describe Panek did not create unacceptable risk that impermissible factors were involved in the jury's consideration of the evidence and was not so inherently prejudicial that Holden was denied a fair trial in violation of federal due process. Holden is therefore not entitled to federal habeas corpus relief for ground 3.

E.   Ground 4 — Failure to Challenge the Sufficiency of the Evidence for First-Degree Murder

Holden claims appellate counsel was ineffective because he failed to challenge the conviction for first-degree murder on the grounds there was insufficient evidence to support the kidnapping charge for purposes of a felony-murder theory of liability, in violation of federal due process. (ECF No. 88 at 50–53.)

The state supreme court addressed this claim as follows:

> [A]ppellant argues that appellate counsel was ineffective for failing to argue on direct appeal that his conviction for first-degree murder is invalid under a felony-murder theory because there was no evidence to support the kidnapping charges. However, as discussed above, there was sufficient evidence to support the kidnapping conviction. Thus, this claim fails and the district court did not err in denying it.

(ECF No. 45 at 153–54.)

As discussed, there was no reasonable probability appellate counsel would have succeeded with a claim that there was insufficient evidence to support the kidnapping convictions. *See, supra*, pp. 25–27; *see Jackson*, 443 U.S. at 319. As such, the state supreme court reasonably applied

*Strickland* in determining appellate counsel was not ineffective for failing to challenge the sufficiency of the evidence to support the felony-murder theory of liability for the first-degree murder conviction, based on first-degree kidnapping as the predicate felony. Holden is therefore not entitled to federal habeas corpus relief for ground 4.

### F.   Ground 5 — Admission of McNutt's Initial Statement to Police

Holden claims the admission of McNutt's initial statement to police at trial violated his due process and confrontation rights under the Sixth and Fourteenth Amendment as set forth in *Crawford v. Washington*, 541 U.S. 36 (2004) (ECF No. 88 at 53–57.)

#### 1.   Additional Background

##### a.   McNutt's Initial Statements to Police

Metro Homicide Detective Jeff Rosgen recorded McNutt's statement within two hours after the shootings of Sutton and Panek. (ECF No. 42-2 at 13.) In his initial statement, McNutt said, *inter alia*, (1) the people at the Niemeyer's home expected Sutton and Panek to return to attack Evans; (2) Holden held Sutton and Panek at gunpoint, yelled at them, threatened to shoot them, threatened to shoot Panek in the leg if he did not sit down, and pointed the gun at their heads; (3) Holden told Sutton and Panek that he didn't want to shoot them but wanted to beat them with the bat; (4) Holden swung the bat at Sutton, but Sutton blocked it; (5) Holden stood so Sutton and Panek couldn't run out the front door; (6) Sutton and Panek tried to apologize but Holden yelled over their voices and told them he was going to shoot them; (7) Panek jumped over the couch onto Holden, someone said "knife," two shots fired while Panek was on top of Holden, and then Panek fell down and did not move; (8) Holden said, "That mother f'er pulled a knife on me," and then shot Sutton as Sutton ran toward McNutt who was in the kitchen; and (9) McNutt scooted out of the way and left on his bike. (*Id.* at 14–19.)

##### b.   Preliminary Hearing

At the preliminary hearing, the justice court permitted the state to impeach McNutt by reading portions of his prior interview with Rosgen because McNutt was somewhat incapable of reading it. (ECF No. 47-3 at 12–13.) The state referred to pages in McNutt's initial statement to police for the benefit of defense counsel during its examination of McNutt until the justice court

permitted the state to treat McNutt as a hostile witness. (*Id.* at 13–17.) Counsel for Holden and Evans each cross-examined McNutt and likewise directed the parties to pages in McNutt's initial statement and read portions of it into the record. (*Id.* at 13–14, 17, 21–22, 28–29, 31, 40–42, 46.) The state moved to admit the transcript and CD for McNutt's initial statement to police, but defense counsel objected on the grounds they were unable to confront and cross-examine McNutt on the parts of the interview statement that were not subject to the state's direct examination. (*Id.* at 44.) The state asserted McNutt was subject to cross-examination on any question defense counsel wished to ask and Holden's counsel was permitted to re-open cross-examination. (*Id.*) The state and defense counsel thereafter engaged in further questioning of McNutt, which included Evans's counsel cross-examining McNutt about at least one of his prior statements to police. (*Id.* at 44–48.) The next day, the justice court admitted the transcripts and CD of McNutt's prior statement to police into evidence. (ECF No. 47-4 at 5–7, 83.)

          c.  Trial

At trial, the parties stipulated McNutt was unavailable to testify, and the state was permitted to read a stipulated redacted version of McNutt's preliminary hearing testimony to the jury. (ECF Nos. 43 at 8–10, 25–61; 43-1 at 5, 30–31.)

The state additionally moved for admission of McNutt's initial statement to police. (ECF No. 43 at 10.) Defense counsel objected arguing admission of the unsworn statement was unfair and violated due process. (*Id.*) The state argued the recorded statement was admitted into evidence at the preliminary hearing and was admissible for substantive and impeachment purposes at trial under NRS § 51.035(2)(a). (*Id.* at 10–11.) Defense counsel claimed the state should not be permitted to play portions of the initial statement not previously presented to McNutt for impeachment at the preliminary hearing. (*Id.* at 11–13, 15.) The state countered that defense counsel had an opportunity to cross-examine McNutt about any inconsistencies between his initial statement to police and his preliminary hearing testimony. (*Id.* at 15.)

The state district court did not admit the initial statement into evidence but permitted it to be read or played to the jury as a prior inconsistent statement because (1) McNutt's preliminary hearing testimony was under oath; (2) his recorded interview was admitted as evidence at the

preliminary hearing; and (3) he was cross-examined about his interview statements at the preliminary hearing. (*Id.* at 16.)

Defense counsel later renewed his objection to admission of McNutt's entire recorded interview arguing the state should only be able to bring in those areas of the prior statement for which McNutt was previously subjected to impeachment with his initial interview statement. (*Id.* at 37.) The tape was played for the jury over defense objection and transcribed into the trial transcript. (*Id.* at 13–19.) Defense counsel later renewed his objection and moved for a mistrial, but the state district court denied the motion. (*Id.* at 23.)

2.   Legal Standards

The Confrontation Clause bars "admission of testimonial statements of a witness who did not appear at trial unless he was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." *Crawford*, 541 U.S. at 53–54.

On direct appeal, a Confrontation Clause error is non-structural error subject to the harmless beyond a reasonable doubt standard enunciated in *Chapman v. California,* 386 U.S. 18, 24 (1967). *Coy v. Iowa*, 487 U.S. 1012, 1021 (1988). On federal habeas review, however, "petitioners 'are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'" *Davis v. Ayala*, 576 U.S. 257, 268–69 (2015) (quoting *Brecht*, 507 U.S. at 637 (additional citation omitted)). "Under this test, relief is proper only if the federal court has 'grave doubt about whether a trial error of federal law had "substantial and injurious effect or influence in determining the jury's verdict."'" *Ayala*, 576 U.S. at 268 (citation omitted).

Although a federal habeas petitioner must meet the *Brecht* standard, that does not mean the state court's [*Chapman*] harmlessness determination has no significance under *Brecht*. *Ayala*, 576 U.S. at 268 "While a federal habeas court need not 'formal[ly]' apply both *Brecht* and 'AEDPA/*Chapman*,' AEDPA nevertheless 'sets forth a precondition to the grant of habeas relief.'" *Id.* (quoting *Fry v. Pliler*, 551 U.S. 112, 119–20 (2007)). Thus, where the highly deferential AEDPA standard applies, a federal habeas court may not overturn a state court's decision "unless that [state] court applied *Chapman* 'in an "objectively unreasonable" manner'" *Id.* at 269–70

1  (citations omitted). A state-court decision is not unreasonable if "'fairminded jurists could

2  disagree' on [its] correctness." *Id.* (citations omitted).

3      When determining whether a confrontation clause error had a "substantial and injurious

4  effect or influence in determining the verdict," a court considers the following factors: (1) the

5  importance of the witness' testimony in the prosecution's case; (2) whether the testimony was

6  cumulative; (3) the presence or absence of evidence corroborating or contradicting the testimony

7  of the witness on material points; (4) the extent of cross-examination otherwise permitted; and (5)

8  the overall strength of the prosecution's case. *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986).

9      3.   State Court Determination

10     The state supreme court denied this claim on direct appeal as follows:

11     Holden next argues that the district court violated his confrontation rights
       under Crawford v. Washington

12     [FN 10] 541 U.S. 36 (2004).

13
14     when it allowed a recording of a voluntary statement that witness Bradley McNutt
       made to the police shortly after the shooting to be played to the jury at trial. McNutt

15     was an acquaintance of the Niemeyers, and one of several teenagers present during
       the shooting at the White Cap house. As indicated above, this court will not reverse

16     a district court's admission of evidence on appeal unless the district court's decision
       was "manifestly erroneous."

17     [FN 11] Medina v. State, 122 Nev. 346, 353, 143 P.3d 471, 474

18     (2006) (citing Lucas v. State, 96 Nev. 428, 431-32, 610 P.2d 727,
       730 (1980)).

19     In Crawford, the United States Supreme Court determined that the
       Confrontation Clause bars the use of a testimonial statement by a witness who does

20     not testify at trial unless the witness is unavailable and the defendant had a prior
       opportunity for cross-examination.

21
22     [FN 12] 541 U.S. at 53-54; see also Flores v. State, 121 Nev. 706,
       714-15, 120 P.3d 1170, 1180-81 (2005). Under Crawford, a

23     statement is testimonial if an objective witness would reasonably
       believe that the statement would be available for later use at trial.

24     Medina, 122 Nev. at 354, 143 P.3d at 476.

25     Similarly, while NRS 171.198(6) and NRS 51.325(1) allow for the admission of
       preliminary hearing testimony at trial, the party offering the testimony must

26     establish that (1) the defendant was represented by counsel at the preliminary
       hearing, (2) counsel actually cross-examined the witness and (3) the witness is

27     actually unavailable for trial.

28     [FN 13] Funches v. State, 113 Nev. 916, 920, 944 P.2d 775, 777-78
       (1997). NRS 171.198(6) specifically allows for the admission of

41

preliminary hearing testimony, while NRS 51.325 provides guidelines for the admission of former testimony in general.

Here, McNutt testified at the preliminary hearing on June 30, 2004. During McNutt's preliminary hearing testimony, McNutt was visibly upset, crying, and answered a majority of questions with "I don't know." Therefore, with the justice court's permission, the State used a number of McNutt's prior inconsistent statements from his voluntary statement to the police for impeachment purposes. Because McNutt had limited reading abilities, this resulted in large portions of McNutt's initial voluntary statement to the police being read into the record. McNutt was subject to cross-examination regarding all of these statements. The justice court also admitted the complete CD recording of McNutt's voluntary statement to the police into evidence, but the recording was not played aloud. At trial, McNutt could not be located, and the parties stipulated to his unavailability. Therefore, the district court allowed the transcript of the preliminary hearing testimony to be reenacted before the jury. The district court also allowed the CD recording of McNutt's prior voluntary statement to the police to be played for the jury.

Holden does not contest McNutt's unavailability, nor does he assert that the district court erred in publishing the transcript of McNutt's preliminary hearing testimony before the jury. However, he argues that the district court's admission of the full recording of McNutt's statement to the police violated his confrontation rights under Crawford. We agree. McNutt's voluntary statement to the police was clearly "testimonial" in nature,

> [FN 14] See Medina, 122 Nev. at 354, 143 P.3d at 476 (reiterating that a statement is testimonial if an objective witness would reasonably believe that the statement would be available for later use at trial).

And he was not subject to cross-examination with respect to any portions of the statement not read into the record at the preliminary hearing. Accordingly, we conclude that admission of the unread portions of McNutt's voluntary statement violated Holden's Sixth Amendment right to confrontation.

Nonetheless, this court reviews Confrontation Clause errors using harmless error analysis.

> [FN 15] Medina, 122 Nev. at 353, 143 P.3d at 476.

Under harmless error analysis, reversal is not required if the State can demonstrate, beyond a reasonable doubt, that the error did not contribute to the jury's verdict.

> [FN 16] Id. at 353, 143 P.3d at 476.

Factors a court may consider in determining whether an error is harmless include "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, . . . and, of course, the overall strength of the prosecution's case."

> [FN 17] Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986).

Using the harmless error standard, we conclude that admission of McNutt's entire voluntary statement was harmless. First, while neither party has included a

42

copy of McNutt's voluntary statement in the record on appeal, it appears that the crucial portions of McNutt's testimony were largely corroborated by other witnesses, as testimony by Sutton, Evans, Heatwole, and Kourtney Niemeyer all established that Holden and Evans forced Panek and Sutton to sit on the couch at gunpoint and that Holden shot Panek when he attempted to defend himself. Second, statements made in Holden's own journal indicated that he intentionally shot Panek and "fooled" the police into thinking that he shot Panek in self-defense. Therefore, in light of the overwhelming evidence presented against Holden, we conclude that admission of McNutt's voluntary statement was harmless beyond a reasonable doubt.

(ECF No. 41-1 at 59–63.)[10]

4.   Analysis of Ground 5

The state supreme court reasonably applied the *Chapman* harmless error standard in determining that the admission of portions of McNutt's initial statement to police that were not subject to cross-examination at the preliminary hearing was harmless beyond a reasonable doubt.

First, McNutt was not a key witness in the case. Second, his initial statement to police corroborated the testimony of Sutton and Evans who each directly participated in the events surrounding the offenses. Third, McNutt's testimony was cumulative in that it confirmed the testimony of others that: (1) Sutton and Panek were expected to return to the Niemeyer home within 72 hours after beating Heatwole to harm Evans; (2) Holden restrained Sutton and Panek at gunpoint and ordered them to sit down; (3) Holden threated to shoot Sutton and Panek if they did not do as he told them; (4) a bat was produced and used to threaten Sutton and Panek; (4) Holden shot Panek when Panek lunged at him; and (5) Holden shot Sutton as Sutton attempted to flee. *See, supra*, pp. 2–7. Fourth, this is not a case where the witness was never subject to cross-examination at all. Defense counsel cross-examined McNutt at the preliminary hearing concerning some of his initial statements to police and defense counsel had a copy of McNutt's initial statement when he cross-examined McNutt. *See, supra*, pp. 40–41. Finally, the state's case was strong due to Holden's handwritten statements in which he admitted he did not commit the offenses in self-defense, told Sutton and Panek they would not leave the home alive, and was paid for his actions.

_____

[10] The state supreme court appears to have reviewed the trial transcript containing McNutt's testimony but may have overlooked the fact that in doing so, it necessarily reviewed McNutt's prior statement to police, which was transcribed directly into the trial transcript while the recording of the statement was played to the jury. (ECF No. 42-2 at 13–19.)

1    Because the state supreme court reasonably applied *Chapman* to the state court record in

2    rejecting the *Crawford* claim, Holden is not entitled to federal habeas corpus relief for ground 5.

3    G.  Ground 6 — Closing Remarks

4    Holden claims the state district court improperly precluded defense counsel from presenting

5    closing remarks concerning the codefendant's plea agreement, in violation of due process under

6    the Fourteenth Amendment. (ECF No. 88 at 56–59.)

7    At Holden's trial, the following colloquy occurred during defense closing remarks:

8    [DEFENSE COUNSEL]: [A]nd so if Mr. Holden is guilty of first-degree murder,
     how is it – how can it justify that Mr. Evans, who clearly is the mastermind
9    ringleader is –

10   [THE STATE]: Judge, I'm going to interpose an objection.

11   THE COURT: Side-bar?

12   [THE STATE]: Yes, Judge.

13   (Discussion at side-bar.)

14   THE COURT: Okay. The objection is sustained. The jury is instructed to
     disregard the argument of counsel regarding Mr. Evans, the last statement
15   of counsel.

16   (ECF No. 41-2 at 56.) Defense counsel later argued to the jury, without objection, "you saw

17   [Evans] was convicted of manslaughter and he's going to do a couple of years" and "Mr. Evans

18   was, in a better sense, the one that was the mastermind or he was the one that was upset." (*Id.* at

19   59.) After closing remarks, the court explained that, at the side-bar conference, defense counsel

20   made an offer of proof that he would have argued Evans was just as responsible for the acts as

21   Holden and would have highlighted the disparity between the first-degree murder charges against

22   Holden and Evans's guilty plea to voluntary manslaughter with use of a deadly weapon. (ECF No.

23   41-2 at 71–72.) The state district court sustained the state's objection to counsel's argument

24   because the jury was not supposed to determine the guilt or innocence of anyone other than the

25   defendant and the court was unsure the state could argue in rebuttal why the state would enter into

26   such a deal. (*Id.* at 72.)

27   "The Constitution guarantees a fair trial through the Due Process Clauses, but it defines

28   the basic elements of a fair trial largely through the several provisions of the Sixth Amendment,

44

including the Counsel Clause . . ." *Strickland*, 466 U.S. 684–85. In *Herring v. New York*, the Supreme Court held a New York statute that permitted trial courts to completely deny defense counsel an opportunity to present summation deprived a defendant of the right to assistance of counsel under the Sixth and Fourteenth Amendments. 422 U.S. 853, 865 (1975). The Supreme Court, however, held that a presiding judge has "great latitude in controlling the duration and limiting the scope of closing summations" and may place time limits on counsel's arguments, "terminate argument when continuation would be repetitive or redundant," and "ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial." *Id.* at 862 (citations omitted).

The state supreme court rejected this claim on direct appeal as follows: "[W]e have also considered Holden's remaining arguments, including those related to . . . restriction of Holden's ability to refer to Evan's [sic] guilty plea during closing argument . . . and conclude that none of these alleged errors deprived Holden of a fair trial." (ECF No. 41-1 at 65–66) (footnote omitted). The court applies AEDPA deference to the state supreme court's determination because the text of its order of affirmance explained its reasons for its decision and its reason "[f]airly appear[s] to rest primarily on federal law or [is] interwoven with [federal] law." *See Ylst*, 501 U.S. at 802 (quoting *Coleman*, 501 U.S. at 740); *see also* ECF No. 47-34 at 35.

The state supreme court's determination was neither contrary to, nor constitutes an unreasonable application of, Supreme Court authority, and is not based on an unreasonable determination of the facts. Defense counsel elicited Evans's testimony that he pleaded guilty to voluntary manslaughter with use of a deadly weapon and that he was sentenced to 5 to 20 years. The prosecution elicited Evans's testimony that he was facing three life sentences when he was charged as Holden's codefendant. *See, supra*, pp. 3–4. And despite the state district court's ruling preventing defense counsel from directly arguing the disparity to the jury in summation, counsel nonetheless argued it was inequitable to punish Evans, as "the mastermind," for lesser charges and "only do a couple of years." Thus, the state supreme court's determination that the state district court's ruling did not deny Holden a fair trial was objectively reasonable, and Holden is not entitled to federal habeas corpus relief for ground 6.

1    H.  Ground 7 — Denial of Immunity for Defense Witness

2          Holden claims the state district court violated due process under the Fourteenth Amendment

3    by failing to grant witness immunity to Leah Niemeyer. (ECF No. 88 at 59–61.)

4          1.   Additional Background[11]

5               a.   Preliminary Hearing

6          The state subpoenaed Leah for the preliminary hearing and defense counsel stated they

7    wished to call her as a witness should the state decide not to do so. (ECF No. 47-2 at 6.) The

8    prosecutor later told the justice court it "may have to admonish" Leah of her right to counsel. (*Id.*

9    at 69.) Counsel for codefendant, Evans, argued the state's request to caution Leah about her right

10   to counsel was "an attempt to stop the defendant from presenting evidence that he's entitled to

11   present." (*Id.* at 74.) Codefendant's counsel proffered Leah would testify that after seeing Sutton

12   and Panek in the fight with Heatwole, she unequivocally told Sutton and Panek to leave the house

13   and not return. (*Id.* at 73.) Counsel proffered Leah would also testify Sutton stayed at her house a

14   few times but did not live there and would testify about the fear people in the house had due to

15   Sutton and Panek's attack on Heatwole. (*Id.* at 73–74.)

16         The justice court admonished Leah the state was concerned (1) she may have prior

17   knowledge of a conspiracy to commit murder; (2) her statements to police might be false, and if

18   so, could expose her to criminal liability; and (3) a journal implicated her as soliciting people to

19   commit murder. (*Id.* at 77–78.) The prosecutor said there were "reasonable grounds to believe that

20   a crime has been committed" and that Leah may have committed it, but no charges were pending,

21   although the state would discuss it with detectives. (*Id*. at 78–79.) The state district court advised

22   Leah she was entitled to a lawyer and Leah requested one. (*Id.* at 79–82.)

23         The prosecutor thereafter summarized the evidence that exposed Leah to criminal charges,

24   including, *inter alia*: (1) Evans's statement that he was looking to kill Sutton and Panek legally by

25   locking the house so they had to climb in through the window; (2) Evans's statement Leah was

26   supposed to be on the telephone to 911 so they could make it look legal; (3) Leah told police they

27   were looking for someone to "protect them"; (4) Holden's journal statement that he was hired to

28   _____

[11] This additional background serves the discussions concerning grounds 7 and 8.

kill and "[t]he one on White Cap did not pay much though, they were poor"; and (5) Leah and Kourtney knew what was going to happen because they walked upstairs before the gun appeared. (*Id.* at 85–90.) The prosecutor said Leah was potentially "on the hook for conspiracy to commit murder and the subsequent murder" "if she paid for protection" "and [if] the protection she paid for was to kill these two individuals." (*Id.* at 90–91.) The prosecutor also informed the court he did not speak to Leah and would tell Detectives Rosgen and Williams there needs to be a further investigation to determine Leah's involvement. (*Id.* at 89–90.) The prosecutor requested the admonishment "out of an abundance of caution." (*Id.* at 90.)

Codefendant's counsel moved to dismiss the charges arguing the prosecution was acting in bad faith and violating the right to present a case by saying it had sufficient evidence to go forward or that it believed Leah had committed a crime, because Leah was not charged, and the state brought up the warning after the defense stated its desire to call her as a witness. (*Id.* at 82–84.) The justice court denied the motion to dismiss and found the prosecutor did not act in bad faith. (*Id.* at 93.) The next day, Leah appeared with appointed counsel and asserted she would invoke her Fifth Amendment rights if called to testify at the preliminary hearing. (ECF No. 47-3 at 3.)

b.  Trial

At trial, the defense wished to call Leah as a witness. (ECF No. 42-1 at 17.) Defense counsel recognized "Evans testified with regard to [Leah] coming down and shutting the door or locking the door," and the state could use that statement with respect to Leah. (*Id.* at 18.) The state argued Leah "certainly needs a lawyer." (*Id.* at 19.) Defense counsel argued Holden had the right to present a defense, Leah "would be happy to make a complete record for this Court" by telling eh court what she would say in her testimony, and argued her testimony was crucial to the defense because she was present at the scene of the shooting. (*Id.* at 20–21.)

The prosecutor argued no one had spoken with Leah other than the judge who previously advised her of her rights, and her counsel. (*Id.* at 21.) Defense counsel argued the state's actions "rose to the level of a threat" and were in bad faith, because evidence implicating Leah had existed for a year, but she was not arrested. (*Id.*) Defense counsel requested a hearing at which Leah would

testify outside the presence of the jury to make an offer of proof, but the state district court declined to do so because it lacked the power to suspend Leah's Fifth Amendment rights. (*Id*. at 21–22.)

The state district court, referring to the 911 tape, noted it had observed "a tape that's been played at least three times in the courtroom with a woman's voice saying what I believe to be saying, 'No one's leaving'" and Evans's testimony about his thoughts of killing Panek. (*Id.* at 23.) The court ruled "it is reasonable to expect that Leah's lawyer or any lawyer would possibly advise her client not to testify, based upon what I've heard and seen," and "If you listen to the tape you can hear it, and it speaks for itself." (*Id.* ) Leah later asserted her Fifth Amendment privilege on the advice of her counsel. (ECF No. 42 at 3.)

2.  Legal Standards

The Compulsory Process Clause of the Sixth Amendment provides a defendant the "right to offer the testimony of witnesses, and to compel their attendance, if necessary." *Washington v. Texas*, 388 U.S. 14, 17–19, 23 (1967) (holding the right to compulsory process "[i]s so fundamental and essential to a fair trial that it is incorporated in the Due Process Clause of the Fourteenth Amendment."); *see also Strickland*, 466 at 685 ("The Constitution guarantees a fair trial through the Due Process Clauses," but also "defines the basic elements of a fair trial largely through the provisions of the Sixth Amendment.")

The right to compulsory process is, however, not absolute and must accommodate other legitimate interests in the criminal trial process in appropriate cases. *See Chambers v. Mississippi,* 410 U.S. 284, 295 (1973). Moreover, "the Sixth Amendment does not by its terms grant to a criminal defendant the right to secure the attendance and testimony of any and all witnesses: it guarantees him 'compulsory process for obtaining *witnesses in his favor.*'" *United States v. Valenzuela–Bernal,* 458 U.S. 858, 867 (1982) (emphasis in original). Furthermore, a defendant's Sixth Amendment right to compulsory process does not include the right to compel a witness to waive the Fifth Amendment privilege against self-incrimination. *See Kastigar v. United States,* 406 U.S. 441, 444–45 (1972).

///

///

48

### 3.  State Court Determination

The state supreme court rejected this claim as follows: "[W]e have also considered Holden's remaining arguments, including those related to . . . denial of Holden's request for witness immunity, . . . and conclude that none of these alleged errors deprived Holden of a fair trial." (ECF No. 41-1 at 65–66) (footnote omitted). The court applies AEDPA deference to the state supreme court's determination because the text of its order of affirmance explained its reasons for its decision and its reasons reason "[f]airly appear[s] to rest primarily on federal law or [is] interwoven with [federal] law." *See Ylst*, 501 U.S. at 802 (quoting *Coleman*, 501 U.S. at 740); *see also* ECF No. 47-34 at 37.

### 4.  Analysis of Ground 7

The state supreme court's determination was neither contrary to, nor constitutes an unreasonable application of, Supreme Court authority, and is not based on an unreasonable determination of the facts.

Holden contends the state district court erred because it failed to grant immunity to Leah based on the judicial immunity, as discussed in *Government of Virgin Islands v. Smith*, 615 F.2d 964 (3d Cir.1980), *abrogated by U.S. v. Quinn* 728 F.3d 243, 254–57. (ECF No. 88 at 59–60.) The state district court was not obliged to follow *Smith* and the judicial immunity espoused in *Smith* does not constitute "clearly established Federal law, as determined by the Supreme Court of the United States." Thus, the state district court's failure to grant immunity was neither contrary to, nor an unreasonable application of, clearly established Federal law, as required for relief under AEDPA. *See, e.g., Carey v. Musladin*, 549 U.S. 70, 77 (2006).

Holden also fails to demonstrate Leah's testimony was either exonerating or favorable to Holden's defense. Holden claims Leah would have testified that Sutton and Panek's were not welcome at the house, their entry constituted a home invasion, and she would have impeached Sutton. (ECF No. 88 at 60.) However, other witnesses, including Kourtney, testified Sutton and Panek were not welcome at the home and Kourtney told them never to return after they attacked Heatwole. The record contradicts Leah's alleged testimony that Sutton and Panek conducted a "home invasion." Evans and McNutt saw Sutton and Panek walk into the house, and although

Evans said they stared at him, neither he nor McNutt did anything to stop Sutton and Panek from entering the home. No one testified that Sutton and Panek made threats or drew weapons when they entered the home. To the contrary, Heatwole testified Sutton and Panek tried to say it was a mistake and they came to make peace. Although Heatwole testified Panek reached into his bag when they first entered the home, Panek did not draw a knife until after a baseball bat was produced by Evans and until Holden had held Sutton and Panek at gunpoint for some time while blocking their nearest exit and threatening to kill them. Finally, Sutton did not draw a weapon when he and Holden struggled for Holden's gun or when Holden shot Sutton as Sutton attempted to flee. Testimony from Leah about a home invasion is also inconsistent with the testimony of her daughter, Kourtney, who testified Leah was upstairs asleep when Sutton and Panek entered the home and the testimony of others who said that Leah locked the door and said no one was to leave. Given the evidence, and the 911 recording supporting Leah's participation, the state supreme court reasonably determined Holden has not shown the absence of Leah's testimony or the failure to grant to her immunity, denied him a fair trial as a matter of federal due process.

For the foregoing reasons, Holden is not entitled to federal habeas relief on ground 7.

I.   Ground 8 — Prosecutorial Misconduct

Holden claims the prosecutor committed misconduct in violation of due process under the Fourteenth Amendment by requesting the state district court advise Leah of her right to counsel. (ECF No. 88 at 61–64.)

1.   Legal Standards

A prosecutor's actions constitute misconduct if they "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden v. Wainwright,* 477 U.S. 168, 181 (1986) (quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 643 (1974)).

The U.S. Supreme Court held a trial judge deprived a defendant of due process of law when, on his own initiative, he singled out the sole defense witness, who happened to be incarcerated, and "effectively drove the witness off the stand" with "unnecessarily strong" admonitions. *Webb v. Texas*, 409 U.S. 95, 98 (1972). The admonitions in *Webb* are as follows:

> Now you have been called down as a witness in this case by the Defendant. It is the Court's duty to admonish you that you don't have to testify, that anything you say can and will be used against you. If you take the witness stand and lie under oath, the Court will personally see that your case goes to the grand jury and you will be indicted for perjury and the likelihood (*sic*) is that you would get convicted of perjury and that it would be stacked onto what you have already got, so that is the matter you have got to make up your mind on. If you get on the witness stand and lie, it is probably going to mean several years and at least more time that you are going to have to serve. It will also be held against you in the penitentiary when you're up for parole and the Court wants you to thoroughly understand the chances you're taking by getting on that witness stand under oath. You may tell the truth and if you do, that is all right, but if you lie you can get into real trouble. The court wants you to know that. You don't owe anybody anything to testify and it must be done freely and voluntarily and with the thorough understanding that you know the hazard you are taking.

*Id.* at 95–96. The Supreme Court held "[I]n light of the great disparity between the posture of the presiding judge and that of a witness in these circumstances, the unnecessarily strong terms used by the judge could well have exerted such duress on the witness' mind as to preclude him from making a free and voluntary choice whether or not to testify." *Id.* at 98.

Although the Supreme Court has not specifically considered whether interference by a prosecutor similar to that in *Webb* would violate a defendant's due process rights, the ninth circuit court of appeals has determined "the conduct of prosecutors, like the conduct of judges, is unquestionably governed by *Webb*." *United States v. Vavages,* 151 F.3d 1185, 1189–90 (9th Cir.1998) (applying *Webb* and asserting "a defendant's constitutional rights are implicated only where the prosecutor or trial judge employs coercive or intimidating language or tactics that substantially interfere with a defense witness' decision whether to testify.") (citations omitted).

2.  State Court Determination

The state supreme court rejected this claim as follows: "[W]e have also considered Holden's remaining arguments, including those related to . . . prosecutorial misconduct . . . and conclude that none of these alleged errors deprived Holden of a fair trial." (ECF No. 41-1 at 65–66). The state supreme court further explained:

> With respect to Holden's claims of prosecutorial misconduct regarding the decision to inform Leah and Kourtney Niemeyer of their Fifth Amendment rights, we specifically note that as established by the Tenth Circuit, "[t]he potential for unconstitutional coercion by a government actor significantly diminishes . . . if a defendant's witness elects not to testify after consulting an independent attorney." U.S. v. Serrano, 406 F.3d 1208, 1216 (10th Cir. 2005) (emphasis deleted). As there appeared to be a legitimate concern that the Niemeyers' testimony could expose them to prosecution, and Leah and Kourtney Niemeyer each spoke with an attorney

before deciding whether to testify, we conclude that the State did not commit prosecutorial misconduct by informing the Niemeyers of their Fifth Amendment rights.

(ECF No. 41-1 at 66 n.24.)

### 3.   Analysis of Ground 8

The state supreme court's determination was neither contrary to, nor constitutes an unreasonable application of, Supreme Court authority, and is not based on an unreasonable determination of the facts. There is no evidence the prosecutor or the state district court effectively drove Leah off the stand in bad faith. At the preliminary hearing and trial, the prosecutor said no one from the state spoke with Leah about the case (aside from her initial statements to police). And the court's admonitions at the preliminary hearing and trial cannot be construed as intimidating or threatening. The justice court laid out the facts that the prosecutor relayed to support the concern that Leah had potential exposure to criminal liability. In the end, Leah asserted her Fifth Amendment privilege on the advice of her counsel. *See, supra*, pp. 47–49.

Holden claims the prosecutor committed misconduct because he advised the justice court to admonish Leah about her right to counsel only because the defense decided to call Leah as a witness at the preliminary hearing. (ECF No. 88 at 61–64.) However, the record reveals the deciding factor was the state's receipt of Holden's journal, which was disclosed to the defense the same day the prosecutor suggested the justice court admonish Leah about her rights. (ECF No. 47-2 at 69.) Holden's journal statements that he was hired for his actions, together with Evans's statements about Leah's participation, and the 911 recording, implicated Leah as a participant in the crimes against Sutton and Panek. And, at trial, the state district court noted the 911 recording played for the jury, demonstrated that during the time Holden held Sutton and Panek at gunpoint, a woman stated no one was to leave. Moreover, Evans and McNutt each testified that Leah was the woman who made that pronouncement while she locked the front door. Thus, as the prosecutor stated, there was evidence to support criminal charges against Leah and it was prudent for the court to advise her of her right to counsel before she testified at the preliminary hearing or trial.

52

On this record, the state supreme court reasonably conducted the prosecutor did not commit misconduct in requesting the state district court inform Leah of her right to counsel. Thus, Holden is not entitled to federal habeas corpus relief for ground 8.

J.   Ground 9 — Improper Jury Instruction on Vicarious Coconspirator Liability

Holden claims the jury instruction on conspiracy permitted the jury to convict him of murder although he had no specific intent to commit murder. (ECF No. 88 at 64–65.)

1.   Additional Background

The coconspirator instruction stated as follows:

> Each member of a criminal conspiracy is liable for each act and bound by each declaration of every other member of the conspiracy if the act or the declaration is in furtherance of the object of the conspiracy.
>
> The act of one conspirator pursuant to or in furtherance of the common design of the conspiracy is the act of all conspirators. Every conspirator is legally responsible for an act of a co-conspirator that follows as one of the probable and natural consequences of the object of the conspiracy even if it was not intended as part of the original plan and even if he was not present at the time of the commission of such act.
>
> In contemplation of the law, the act of one is the act of all.

(ECF Nos. 41-2 at 42, 47; 44 at 39.) Counsel objected to the last sentence but not the second sentence, which includes the "natural and probable consequences" standard. (ECF No. 41-2 at 47.)

2.   Legal Standards

The Supreme Court has held that "[t]he Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *Sandstrom v. Montana*, 442 U.S. 510, 521 (1979); *see also Winship*, 397 U.S. at 364. To obtain federal habeas relief based on an improper jury instruction, a petitioner must establish that the instruction so infected the entire trial that the resulting conviction violates due process. *Estelle,* 502 U.S. at 72.

Prior to the finality of Holden's convictions, the state supreme court, held in *Bolden v. State*, that "a defendant may not be held criminally liable for the specific intent crime committed by a coconspirator simply because that crime was a natural and probable consequence of the object of the conspiracy." 121 Nev. 908, 915–923, 124 P.3d 191, 196–201 (2005), *overruled on other*

*grounds by Cortinas v. State*, 124 Nev. 1013, 1026–27 195 P.3d 315, 324 (2008). In *Bolden*, the state supreme court, believing the Supreme Court had not ruled whether harmless error analysis was available in cases where a jury delivers a general verdict that could have been based on either a legally valid or legally invalid ground, adopted "the absolute certainty rule," i.e., reversal is not required if "it is absolutely certain" that the jury relied upon the legally correct theory to convict the defendant." *Id.* at 923–24, 124 P.3d at 201 (relying on *Keating v. Hood,* 191 F.3d 1053, 1063 (9th Cir. 2005)).

3.   State Court Determination

The state supreme court rejected this claim on direct appeal as follows:

Jury instruction on vicarious coconspirator liability

Finally, we examine Holden's assertion that the district court erroneously instructed the jury regarding vicarious coconspirator liability. In addition to other theories of liability, the State charged Holden with first-degree murder and attempted murder as a coconspirator. To this end, jury instruction sixteen provided,

Every member of a criminal conspiracy is liable for each act and bound by each declaration of every other member of the conspiracy if the act or the declaration is in furtherance of the object of the conspiracy.

The act of one conspirator pursuant to or in furtherance of the common design of the conspiracy is the act of all conspirators. Every conspirator is legally responsible for an act of a co-conspirator that follows as one of the probable and natural consequences of the object of the conspiracy even if it was not intended as part of the original plan and even if he was not present at the time of the commission of such act.

In the contemplation of the law, the act of one is the act of all.

After trial, but while Holden's appeal was pending, this court issued its opinion in Bolden v. State, rejecting the "natural and probable consequence" doctrine and concluding that a defendant cannot be found guilty of specific intent crimes on the basis that commission of those offenses was a natural and probable consequence of a conspiracy.

[FN 18] 121 Nev. 908, 922, 124 P.3d 191, 201 (2005).

In determining whether the error resulting from the use of a "natural and probable consequence" jury instruction was harmless, this court further indicated that when a jury issues a general verdict that could be based on either a legally valid or invalid ground, "the verdict may not stand, because a reviewing court cannot discern the ground upon which the jury based its verdict."

54

[FN 19] Id. at 923, 124 P.3d at 201.

Thus, even if sufficient evidence exists to prove the defendant directly liable for the underlying offenses, reversal is required unless "it is absolutely certain that the jury relied upon the legally correct theory to convict the defendant."

[FN 20] Id. at 924, 124 P.3d at 201 (internal quotations omitted).

We conclude that under Bolden, the district court clearly erred in issuing jury instruction 16. Because the jury returned its verdicts for first-degree murder and attempted murder on a general verdict form, Holden's convictions for these charges must be reversed unless it is absolutely certain that the jury did not rely upon the conspiracy theory to convict Holden. Based on the evidence presented at trial, we conclude that, in this case, it is absolutely certain that the jury did not rely on the invalid theory.

To obtain a conviction for first-degree murder, the State must establish, beyond a reasonable doubt, a "willful, deliberate and premeditated killing" by the defendant.

[FN 21] NRS 200.030(a).

In other words, "'"the state must prove that a design to kill was distinctly and rationally formed in the mind of the perpetrator, at or before the time the fatal blows were struck.'""

[FN 22] Byford v. State, 116 Nev. 215, 245, 994 P.2d 700, 720 (2000) (Maupin, J., concurring) (quoting Powell v. State, 108 Nev. 700, 701, 838 P.2d 921, 921 (1992) (quoting Briano v. State, 94 Nev. 422, 423, 581 P.2d 5, 6 (1978))).

The amount of time between the formation of the design to kill and the killing itself is irrelevant.

[FN 23] Id.

Here, Holden, not Evans, actually fired the shots at Panek and Sutton. Prior to firing the shots, he held both victims on the couch for several minutes at gunpoint. Although no one conclusively identified Holden's voice on the 911 recording, Evans admitted that he asked Holden to shoot Panek and the transcript indicates that an unidentified male answered, "I'm gonna . . . right now." In his own journal, Holden admitted that the shooting was premeditated, and not in self-defense. Accordingly, we conclude that the jury did not rely on vicarious coconspirator liability to convict Holden of first-degree murder and attempted murder.

(ECF No. 41-1 at 63–66.)

4.   Analysis of Ground 9

The state supreme court's application of the "absolute certainty" harmless error standard constituted an unreasonable application of Supreme Court authority because, at the time of the state supreme court's decision, the Supreme Court had never held that reviewing courts should

apply an "absolutely certain" harmless error test to instructional errors arising in the context of multiple theories of guilt where one theory was invalid. Instead, at the time of the state supreme court's determination in Holden's case, clearly established Supreme Court authority held the *Chapman/Brecht* harmless error standards applied to instructional errors. *See, e.g., Neder v. United States,* 527 U.S. 1, 4 (1999) (holding omission of an element of an offense in instruction is subject to *Chapman* harmless error analysis); *California v. Roy,* 519 U.S. 2, 4–5 (1996) *(per curiam)* (holding *Brecht* harmless error analysis applies to trial error, i.e., erroneous aider and abettor instruction on federal habeas review); *Calderon v. Coleman*, 525 U.S. 141, 145–47 (1998) (citing *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993) (holding failure to apply *Brecht* harmless error test to instructional error required reversal). The court therefore conducts *de novo* review of whether the instructional error had a "substantial and injurious effect or influence in determining the jury's verdict" but concludes it did not. *Brecht,* 507 U.S. at 637.

As discussed, there was evidence for the jury to determine, even apart from the intentions and actions of Evans and Leah, that Holden personally kidnapped and shot the victims for purposes of the convictions for first-degree murder and attempted murder, based on a felony-murder theory of liability. *See, supra*, at pp. 25–26. In his journal, Holden said he was a hitman, an enforcer, was compensated for his actions at the Niemeyer home, and relished killing and torturing other people. In his journal, he also wrote that he told Sutton and Panek they would not leave the Niemeyer home alive, and that he fooled police into believing he acted in self-defense. Witnesses testified Holden personally held Sutton and Panek at gunpoint even before Evans entered the Niemeyer home, personally blocked the nearest exit, personally threatened to kill them if they did not do as he commanded, and personally shot Panek "execution style" and then shot Sutton while Sutton attempted to flee. *See, supra*, at pp. 2–9 Evidence that Holden was charged with killing another man, Garcia, was also admitted for the purposes of proving his intent and motive in the instance case.  There was also evidence that Holden's actions aided and abetted Evans, who testified he wished to kill Panek and that it would alright with him if Sutton died too, because the two acted in concert and Evans encouraged Holden to shoot Sutton and Panek. *See, supra*, at pp. 2–7.

On this record, the erroneous coconspirator instruction permitting the jury to rely upon the intent and actions of Evans, and perhaps Leah, to convict Holden based on a vicarious coconspirator theory, did not have a substantial and injurious effect on the determination of the verdict. As such, Holden is not entitled to federal habeas relief for ground 9.

K. Ground 10 — Sufficiency of the Evidence for Intent to Commit First-Degree Murder

Holden claims the evidence was insufficient to support any specific intent to commit the crime of intentional murder. (ECF No. 88 at 65–66; *see also* 47-34 at 42–43.)

The state supreme court rejected this claim on direct appeal as follows: "[W]e have also considered Holden's remaining arguments, including those related to . . . sufficiency of evidence and conclude that none of these alleged errors deprived Holden of a fair trial." (ECF No. 41-1 at 65–66) (footnote omitted). AEDPA deference applies to the state supreme court's determination because the text of its order of affirmance explained its reasons for its decision and the decision "[f]airly appear[s] to rest primarily on federal law or [is] interwoven with [federal] law." *See Ylst*, 501 U.S. at 802 (quoting *Coleman*, 501 U.S. at 740); *see also* ECF No. 47-34 at 42–43.)

The state supreme court reasonably determined Holden was not deprived a fair trial based a claim there was insufficient evidence to support the jury's determination that he intended to kill Panek for purposes of the first-degree murder conviction. Based on the evidence discussed for grounds 4 and 9, a rational jury could find beyond a reasonable doubt that Holden harbored the intent to kill necessary to convict Holden of the first-degree murder of Panek. As such, the state supreme court's determination was neither contrary to, nor an unreasonable application of, Supreme Court authority, and did not constitute an unreasonable determination of the facts and Holden is not entitled to federal habeas corpus relief for ground 10.

V. Certificate of Appealability[12]

This is a final order adverse to Holden. Rule 11 of the Rules Governing Section 2254 Cases requires this Court to issue or deny a certificate of appealability ("COA"). This Court therefore has *sua sponte* evaluated the claims within the petition for suitability for the issuance of a COA. *See* 28 U.S.C. § 2253(c); *Turner v. Calderon*, 281 F.3d 851, 864–65 (9th Cir. 2002). Under

---

[12] Holden's remaining request for an evidentiary hearing is denied. (ECF No. 88 at 14.)

§ 2253(c)(2), a COA may issue only when the petitioner "has made a substantial showing of the denial of a constitutional right." With respect to claims rejected on the merits, a petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (citing *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)). Applying this standard, the court finds a certificate of appealability is unwarranted.

VI. Conclusion

**IT IS THEREFORE ORDERED** that the second amended petition (ECF No. 88) is **DENIED** in its entirety.

**IT IS FURTHER ORDERED** that a Certificate of Appealability is denied as to all grounds. Reasonable jurists would additionally not find the court's dismissal of Grounds 1, 2(B), 11 and 12 as untimely, debatable or wrong and reasonable jurists would not find it debatable whether this Court was correct in its procedural ruling that Ground 2(D) was unexhausted, for the reasons stated in ECF No 97.

**IT IS FURTHER ORDERED** the Clerk of Court is directed to substitute William Hutchings for Respondent Dwight Nevins.

**IT IS FURTHER ORDERED** that the Clerk shall enter judgment and close this case.

DATED March 4, 2022.

_____
JAMES C. MAHAN
UNITED STATES DISTRICT JUDGE

58